IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

CLINTON GROUP, INC.

Plaintiff,

v.

GONTRAN DE QUILLACQ, an
Individual, and NAVESINK
INTERNATIONAL, LLC,

Defendants.

Index No.     24-cv-5195

ECF CASE

**COMPLAINT**

**JURY TRIAL DEMANDED**

COMES NOW Plaintiff, Clinton Group, Inc., by and through its attorneys, Wylie Stecklow PLLC, and as and for its Complaint against defendant Gontran de Quillacq (hereinafter "Defendant" or "de Quillacq") states and alleges on personal knowledge all facts alleged herein, except those allegations which Plaintiff identifies herein as based upon information and belief.

## NATURE OF THE ACTION

1.      This is an action to recover damages for injuries caused by Defendant de Quillacq's fraud, a fraud intended to induce Plaintiff to enter into employment contracts subject to a Fee Agreement for recruiting services. The fraudulent acts consisted first of de Quillacq's false representation that his sole purpose in approaching Plaintiff was to solicit and obtain investment capital for a start-up hedge fund. It also consisted of de Quillacq's material omission – indeed, his intentional concealment – of a crucial fact known to him at the time Clinton Group hired de Quillacq's team: that Defendant Navesink would seek placement fees specified in a form agreement on its website and hyper-linked in tiny font at the bottom of some, but not all, of de Quillacq's emails to Plaintiff. Plaintiff seeks the damages it incurred as a direct result of that fraud.

2.     In its second cause of action, Plaintiff seeks also to recover from de Quillacq the costs and attorneys' fees which it has incurred in defending itself in an action that Navesink brought against it as a direct result of de Quillacq's tortious conduct alleged herein.

## THE PARTIES, JURISDICTION AND VENUE

3.     Plaintiff Clinton Group, Inc. is a foreign corporation formed and existing under the laws of the State of Delaware and authorized to do business in the State of New York.  Plaintiff maintains its principal place of business at 6 East 69th Street, New York, New York 10021.

4.     Defendant De Quillacq is a natural person and is either a citizen of the State of New Jersey or a citizen of a foreign state who is a lawfully admitted permanent resident in the United States residing in the State of New Jersey.

5.     Defendant Navesink International, LLC ("Navesink") is a closely-held limited liability corporation formed and existing under the laws of the State of New Jersey.  Defendant Navesink is wholly owned by Elizabeth de Quillacq, who is either a citizen of the State of New Jersey or a citizen of a foreign state who is a lawfully admitted permanent resident in the United States residing in the State of New Jersey.

6.     Pursuant to 28 U.S.C. § 1332(a)(1), this Court has original jurisdiction over this action because the amount in controversy is over $75,000; the Plaintiff is a citizen of the State of Delaware; the Individual Defendant de Quillacq is a citizen of the State of New Jersey or a citizen of a foreign state who is a lawfully admitted permanent resident in the United States residing in the State of New Jersey; and the

Limited Liability Company Defendant is wholly owned by a citizen of the State of New Jersey or a citizen of a foreign state who is a lawfully admitted permanent resident in the United States residing in the State of New Jersey.

7.     Pursuant to 28 U.S.C. § 1391(b), venue is properly vested in this Court because a substantial part of the events giving rise to Plaintiff's claims occurred in this judicial district.

## PLAINTIFF'S SPECIFIC FACTUAL ALLEGATIONS

8.     In January or February 2017, Defendant de Quillacq contacted Sorin Alexe, who was the developer of certain software that applies mathematical models to do research in equity for use in the hedge fund industry.

9.     In January or February of 2017, Mr. Alexe and de Quillacq began discussing the potential to start a partnership for a start-up hedge fund.

10.     de Quillacq told Mr. Alexe that he had a contact who worked at Clinton Group and through whom he and Mr. Alexe might have an opportunity to raise money to create a partnership and start a hedge fund.

11.     All of the discussions concerning professional matters that de Quillacq had with Mr. Alexe in January or February of 2017 exclusively concerned raising money to start a hedge fund.

12.     In his discussions with Mr. Alexe in January or February of 2017, de Quillacq did not raise or discuss employment or other opportunities with Mr. Alexe.

13.     On March 24, 2017, de Quillacq emailed Peter Rawlins, who worked at Clinton Group and whom de Quillacq knew socially, seeking an opportunity to make a pitch to Clinton Group.

14.     In his March 24, 2017 email to Clinton Group, de Quillacq explained that his skills were well suited to the hedge fund industry because, he claimed, he had an advantage in attracting clients to invest in hedge funds.

15.     In his March 24, 2017 email to Clinton Group, de Quillacq claimed that his advantage in attracting clients to invest in hedge funds stemmed from his purported "understanding of strategies," which, he claimed, gave him a comparative advantage, "an edge in conversation" with both fund project managers and clients.

16.     de Quillacq inquired in his March 24, 2017 email to Clinton Group whether Clinton Group would have an interest in forming a long-term partnership with him and Mr. Alexe to form a hedge fund.

17.     In order to help explain an initial trading strategy the proposed partnership would employ, de Quillacq included at least one attachment in his March 24, 2017 email to Clinton Group.

18.     de Quillacq was clear in his March 24, 2017 email to Clinton Group that he was seeking to leverage his skills by starting a hedge fund of which he would be the Manager / General Partner.

19.     de Quillacq's March 24, 2017 email to Clinton Group does not identify him as a recruiter.

20.     Years later, de Quillacq testified and admitted under oath that his March 24, 2017 email simply "introduce[d] myself to open a conversation and I demonstrated as saying I am highly competent as an individual. That's what it means."

21.     In March 2017, Defendant Navesink was actually a recruiting agency.

22. Defendant Navesink was formed in 2016 as a recruiting agency.

23. Defendant Navesink is owned by Elizabeth de Quillacq.

24. Upon information and belief, by March, 2017, placement of candidates in senior executive and technical positions in the financial sector was the only service which Defendant Navesink had provided to clients since its formation.

25. Upon information and belief, by March, 2017, the primary service which Defendant Navesink had provided since its formation was placement of candidates in senior executive and technical positions in the financial sector.

26. Upon information and belief, by March, 2017, Defendant Navesink's sole source of revenue since its formation had been placement of candidates in senior executive and technical positions in the financial sector.

27. Upon information and belief, in March 2017, the majority of Defendant Navesink's revenue since its formation was generated by placing candidates in senior executive and technical positions in the financial sector.

28. Upon information and belief, at no time prior to March 24, 2017 had Defendant de Quillacq been employed in a hedge fund in a business development role with responsibility for attracting investments.

29. Upon information and belief, at no time prior to March 24, 2017 had Defendant de Quillacq been a principal or partner in a hedge fund in a business development role with responsibility for attracting investments.

30. Upon information and belief, at no time prior to March 24, 2017, had Defendant de Quillacq been employed in a hedge fund to conduct conversations with fund project managers and clients in order to attract investments.

31. Upon information and belief, at no time prior to March 24, 2017, had

Defendant de Quillacq conducted conversations, in the capacity and as a hedge fund principal or partner, with fund project managers and clients to attract investments.

32.     de Quillacq later testified under oath that his March 24, 2017 email "does not" communicate that he was seeking to provide recruiting or placement services to Clinton Group.

33.     When he sent his March 24, 2017 email, de Quillacq took specific steps to deliberately conceal the fact that he was seeking to establish a contract for recruitment services.

34.     Among these specific steps, de Quillacq intentionally and deliberately did not use his company email address Recruiters@navesink.com, because, he later testified, "for whatever reason people are not interested in talking to recruiters."

35.     As a result of the March 24, 2017 email and an exchange of scheduling emails over the next four days, de Quillacq arranged a meeting with representatives from Clinton Group at a restaurant called "Salt Creek", on March 29, 2017.

36.     Also among the specific steps de Quillacq used to conceal the fact that he was seeking to establish a contract for recruitment services, de Quillacq continued to avoid using a company email address that identified him as a recruiter to arrange the Salt Creek meeting.

37.     At the Salt Creek meeting, de Quillacq continued to conceal that he was seeking to establish a contract for recruitment services.

38.     Instead, at the Salt Creek meeting, de Quillacq represented that he was solely seeking a partnership between Clinton Group and his team, to start a new hedge fund using trading strategies based on mathematical models developed by Sorin Alexe.

39.     At the Salt Creek meeting, de Quillacq mentioned, in describing his background, that in the past he had done some recruiting between jobs.

40.     At the Salt Creek meeting, de Quillacq represented that he was not seeking to do business with Clinton Group as a recruiter.

41.     At the Salt Creek meeting, de Quillacq represented that he was proposing to join Clinton Group as part of a team called QML IM, which he had organized, of four or five people including himself, to start a hedge fund which would execute trading strategies based on Mr. Alexe's mathematical models.

42.     Two days later, on March 30, 2017, subsequent to the Salt Creek meeting, Defendants sent an email beginning, "We would like to introduce QML IM to GlassBridge / The Clinton Group for investment consideration."

43.     At the very bottom of Defendants' March 30, 2017 email, underneath de Quillacq's signature and the Navesink company logo, appearing in tiny type much smaller than any other words in the email, is the sentence: "Unless we have a contract in place, you agree to our legal terms."

44.     de Quillacq later testified that the words 'legal terms' are a hyperlink to Defendants' website.

45.     Navesink did not attach a contract for performance of recruiting services or placement of candidates to its March 30, 2017 email.

46.     Navesink never sent a contract for performance of recruiting services or placement of candidates to the Clinton Group.

47.     Clinton Group never executed an agreement with Navesink for recruiting services.

48.   Instead, the QML IM team presented itself to Clinton Group and explained its investment proposal at two meetings held in Clinton Groups offices in Manhattan.   The team members had a trading strategy backed by models and computers that forecast stock prices.   In the two meetings at Clinton Group's offices, the team members, including de Quillacq, explained that they were seeking to raise capital to start their own investment management business.

49.   At those pitch meetings, the QML IM team asked Clinton Group to invest capital to fund the business and to be invested using the trading strategies and models which de Quillacq presented in the pitch meetings.

50.   At those pitch meetings, de Quillacq represented that his sole purpose in approaching Clinton Group was to raise money to start a hedge fund with the QML IM team.

51.   At those pitch meetings, the sole purpose de Quillacq revealed to Clinton Group for holding the meetings was the QML IM team's endeavor to raise money to start a hedge fund.

52.   After and based on the first pitch meeting, de Quillacq told Mr. Alexe privately that, if Clinton Group hired one or more of the team members as employees instead of providing funds for the team to manage as its partner, de Quillacq would seek to force Clinton Group to pay a recruiting fee.

53.   de Quillacq did not mention in the first pitch meeting, or in any subsequent pitch meeting, that if Clinton Group hired the QML IM team as employees, Navesink would claim a fee in return for de Quillacq's introduction of the QML IM team, including himself, to Clinton Group.

54.    On July 7, 2017, following and based on the several pitch meetings with the QML IM team, Clinton's CEO George Hall wrote Mr. Alexe.  Mr. Alexe forwarded the email to de Quillacq immediately upon receipt.

55.    Instead of agreeing to invest in the QML team as de Quillacq had proposed and pitched to Clinton Group, in the July 7, 2017 email Clinton Group offered salaried positions with specific employment terms pursuant to which it would bring Mr. Alexe, de Quillacq, and a third team member on as salaried employees.

56.    Mr. Hall's July 7, 2017 email set forth an explicit employment offer with comprehensive terms.

57.    In his July 7, 2017 employment offer, Mr. Hall proposed that each of "3 employees" would have a set "base salary" in addition to "bonus compensation" determined by a formula and based on a percentage of incentive fees, and finally that each employee would be entitled to "full benefits" upon agreement to employment terms.

58.    In his July 7, 2017 email Mr. Hall defined "other non-formula based compensation" as dependent on "growth in overall business, contributions to existing Clinton strategies, mutual fund growth and other non-performance based revenues."

59.    The terms of the July 7, 2017 employment offer did not include a placement fee and Mr. Hall's email did not otherwise mention a placement fee.

60.    When he received Clinton Group's July 7, 2017 employment offer, de Quillacq knew that Clinton Group believed his sole purpose was to start a hedge fund with the QML IM team.

61.    When he received Clinton Group's July 7, 2017 employment offer, de

Quillacq knew that Clinton Group was unaware that Navesink would seek to force it to pay a placement fee if it hired QML IM team members as employees.

62.    At no time after receiving Clinton Group's July 7, 2017 employment offer and prior to acceptance of that offer by any member of the QML team did de Quillacq tell anyone at Clinton Group that Navesink would seek a placement fee if the team members were hired as employees.

63.    After receiving Clinton Group's July 7, 2017 employment offer, de Quillacq intentionally did not reveal to Clinton Group that Navesink would seek a placement fee if it hired the team members as employees.

64.    After receiving Clinton Group's July 7, 2017 employment offer, de Quillacq continued to strategically conceal from Clinton Group that Navesink would seek a placement fee if it hired the team members as employees.

65.    de Quillacq later testified under oath that if he had "claim[ed] my placement fee they could have stopped the hiring immediately" and would "owe [me] nothing, and, therefore, it made sense not to" reveal to Clinton Group that Navesink would seek a placement fee under the terms Clinton Group had proposed. de Quillacq later testified under oath that "[i]t is rational" not to mention placement fees before or even at the time of hiring, because such fees increase over time.

66.    In fact, de Quillacq was correct that Clinton Group would not have accepted his approach had he revealed that Navesink would seek a placement fee if Clinton Group hired the team members as employees. In fact, Clinton Group did not regularly use recruiters, and it deliberately followed the industry standard practice of negotiating placement fees and agreeing to such fees in writing on those occasions when it did use recruiters.

67.   In making its July 7, 2017 employment offer, the Clinton Group relied on de Quillacq's false representation that he was solely approaching it as a member of a team seeking start-up investment funding in the hedge fund industry.

68.   But for de Quillacq's misrepresentation that his sole purpose in approaching Clinton Group was to raise capital for a start-up hedge fund, the Clinton Group would not have made its July 7, 2017 employment offer.

69.   But for de Quillacq's misrepresentation that his sole purpose in approaching Clinton Group was to raise capital for a start-up hedge fund, the Clinton Group would not have entered into any transaction with the QML IM team.

70.   As de Quillacq later correctly testified, if he had failed to conceal that Navesink would seek a placement fee if Clinton Group hired the team members as employees, Clinton Group would not have made its July 7, 2017 employment offer.

71.   After receiving the July 7, 2017 employment offer, de Quillacq knew, correctly, that if he did not continue to conceal that Navesink would seek a placement fee if Clinton Group hired the team members as employees, Clinton Group would not enter any transaction with the QML team.

72.   When it made the July 7, 2017 employment offer, Clinton Group was aware of, and relied on, widely-known, industry standard practice in the recruiting industry that requires recruiters who will seek a placement fee to explicitly negotiate placement fee agreements in advance.

73.   When it made the July 7, 2017 employment offer, Clinton Group was aware of, and relied on, widely-known, industry standard practice in the recruiting industry that requires recruiters who will seek placement fees to memorialize such

fees in written agreements executed by all parties in advance.

74.    Indeed, de Quillacq testified that "it's not appropriate" for a recruiter to claim a fee for placing a person with a company if that person does not know the recruiter is seeking a placement fee from the company.  Mr. Alexe testified that he "didn't know [de Quillacq] was trying to place me," and "I didn't know he was looking to get some fees."

75.    Without revealing to the other QML team members that his interest in the transaction was primarily to surreptitiously cause Clinton Group to incur fee obligations to Navesink through Navesink's website's "legal terms" hyper-linked in tiny font at the bottom of his emails, on July 7, 2017 de Quillacq held a conference call with Mr. Alexe and the third member of the team to discuss the terms of Clinton Group's employment offer.

76.    Mr. Alexe and de Quillacq accepted Clinton Group's employment offer.

77.    Mr. Alexe and de Quillacq started working at Clinton Group as salaried employees on July 10, 2017.

78.    On July 10, 2017, the third member of the team reported to Clinton Group's offices, but after half a day informed Mr. Alexe that he was not interested in a salaried employment position and left.

79.    de Quillacq received regular payroll salary payments throughout his approximate four-month term as an employee of the Clinton Group.

80.    At Clinton Group and as Clinton Group employees, Mr. Alexe was de Quillacq's supervisor.

81.    Mr. Alexe later testified that de Quillacq was unable to fulfill the fundraising role for which he had been hired.

82.     Mr. Alexe testified that in November, 2017 de Quillacq was terminated as an employee of Clinton Group because he was unable to fulfill the fundraising role for which he had been hired.

83.     On January 12, 2018, approximately seven weeks after his employment at Clinton Group was terminated, de Quillacq sent an email to Clinton Group inquiring about severance pay.  de Quillacq did not mention anything about any potential entitlement of Navesink to a placement fee in his January 12, 2018 email.

84.     Over nine months later, on September 24, 2018, Navesink sued Clinton Group in the State Supreme Court for New York County under Index Number 654722/2018.

85.     In its complaint in that action, Navesink identified itself as an executive recruitment and placement agency, and it alleged breach of contract and quasi-contract claims supposedly arising from an alleged placement fee which it further falsely alleged was defined by and owed to it under a "Fee Agreement," into which, it yet further falsely alleged, Clinton Group had entered.

86.     Clinton Group was forced to defend itself against Navesink's baseless false allegations and meritless claims in a lengthy litigation which included extensive discovery and motion practice.

87.     Clinton Group was forced to expend over $133,728 in legal fees and expenses to defend itself against Navesink's baseless false allegations and meritless claims.

88.     After years of litigation imposing considerable expense on Plaintiff, the Honorable Judge Debra James of State Supreme Court granted Clinton Group a

dismissal with prejudice of all of Navesink's claims at summary judgment in Index Number 654722/2018 on April 5, 2024.

89.     The issue of whether de Quillacq represented that Navesink would not claim a placement fee was fully litigated in Index Number 654722/2018 in the State Supreme Court for New York County and was extensively argued by both parties in that Court.

90.     In its April 5, 2024 Decision and Order in Index Number 654722/2018, the State Court found as a fact and finally determined that Navesink made no representation to create "a reasonable expectation of compensation."

91.     In its April 5, 2024 Decision and Order in Index Number 654722/2018, the State Court found as a fact and finally determined that Navesink never alerted Clinton Group to the "purported recruitment agreement," which it also found "does not even identify Clinton as the counterparty."

92.     In its April 5, 2024 Decision and Order in Index Number 654722/2018, the State Court found as a fact and finally determined that "there was no understanding that Navesink would be seeking a fee for recruitment services, as demonstrated by Navesink's own documentary evidence and testimony."

93.     The State Court's findings of fact and final determinations that: i) Navesink made no representation to create "a reasonable expectation of compensation,"; ii) Navesink never alerted Clinton Group to the "purported recruitment agreement", and; iii) there "was no understanding that Navesink would be seeking a fee for recruitment services", were all necessary and essential to the Court's decision and judgment granting Clinton Group dismissal with prejudice of Navesink's baseless contract claims in Index Number 654722/2018.

94. The State Court's findings of fact and final determinations that: i) Navesink made no representation to create "a reasonable expectation of compensation,"; ii) Navesink never alerted Clinton Group to the "purported recruitment agreement", and; iii) there "was no understanding that Navesink would be seeking a fee for recruitment services", are each *res judicata*; consequently, Defendants are precluded from denying the State Court findings of fact and final determinations stated in Paragraphs 91, 92, and 93 herein.

95. The issue of whether Navesink represented to Clinton that it was not seeking to do business with Clinton as a recruiter was fully litigated in Index Number 654722/2018 in the State Supreme Court for New York County and was extensively argued by both parties in that Court.

96. In its April 5, 2024 Decision and Order in Index Number 654722/2018, the State Court found as a fact and finally determined that "Navesink's email communications demonstrate that Navesink approached Clinton, as a potential investor, not as a recruiter."

97. In its April 5, 2024 Decision and Order in Index Number 654722/2018, the State Court found as a fact and finally determined that de Quillacq's March 30, 2017 email "makes no mention of recruitment services or identifies Gontran as a recruiter."

98. The State Court's findings of fact and final determinations that: i) "Navesink's email communications demonstrate that Navesink approached Clinton, as a potential investor, not as a recruiter", and; ii) that de Quillacq's March 30, 2017 email "makes no mention of recruitment services or identifies Gontran as a recruiter",

15

were necessary and essential to the Court's decision and judgment granting Clinton Group dismissal with prejudice of Navesink's baseless quasi-contract claims in Index Number 654722/2018.

99.     The State Court's findings of fact and final determinations that: i) "Navesink's email communications demonstrate that Navesink approached Clinton, as a potential investor, not as a recruiter", and; ii) that de Quillacq's March 30, 2017 email "makes no mention of recruitment services or identifies Gontran as a recruiter", are both *res judicata*; consequently, Defendants are precluded from denying the State Court findings of fact and final determinations stated in Paragraphs 97 and 98 herein.

100.    Final Judgment dismissing Index Number 654722/2018 was entered on July 9, 2024.

## FIRST CAUSE OF ACTION
## **FRAUD IN THE INDUCEMENT**
(Against de Quillacq and Navesink,
as Joint and Several Tortfeasors)

101.    Plaintiff repeats and realleges the foregoing paragraphs as if the same were fully set forth at length herein.

102.    Upon information and belief, de Quillacq was at all relevant times acting for and on behalf of, and with actual agency authority invested in it by, Defendant Navesink International LLC.

103.    de Quillacq falsely represented in his March 24, 2017 email to Clinton Group employee Peter Rawlins that his sole purpose in meeting with Clinton Group would be to solicit investment funding for a start-up hedge fund to be managed by his

team.

104.   de Quillacq therefore, to conceal that his representation was false, did not use his company email address Recruiters@Navesink.com when he sent his March 24, 2017 email.

105.   At the March 29, 2017 meeting at Salt Creek, de Quillacq represented that his sole purpose in meeting with Clinton Group would be to solicit investment funding for a start-up hedge fund to be managed by his team.

106.   de Quillacq represented in his March 30, 2017 email to Clinton Group that his sole purpose in seeking a meeting was to solicit investment funding to be used as capital for a start-up hedge fund to be managed by his team.

107.   In each and all of the pitch meetings held at Clinton Group's offices, de Quillacq represented that his sole purpose was to solicit investment funding for a start-up hedge fund to be managed by his team.

108.   Each and all of those representations were knowingly false when made.

109.   In fact, by the time of the first pitch meeting, de Quillacq had already implemented Defendants' plan, the actual purpose of purpose of which was to cause Clinton Group to incur placement fee obligations to Navesink, through Navesink's website's "legal terms", which were hyper-linked in tiny font at the bottom of de Quillacq's emails.

110.   de Quillacq knew that Clinton Group would not meet with him if he failed to conceal that one of his objectives was to cause Clinton Group to incur placement fee obligations to Navesink, through Navesink's website's "legal terms", which were hyper-linked in tiny font at the bottom of his emails.

111.   Plainly put, de Quillacq attempted to surreptitiously establish a

contract for recruitment services with Clinton Group, by means of a tiny hyper-link at the bottom of his emails, so that Navesink could later attempt to force Clinton Group to pay placement fees.

112.   de Quillacq deliberately concealed that he was attempting to establish a contract for recruitment services with Clinton Group because he believed –correctly – that Clinton would not do business with a recruiter.

113.   Instead, de Quillacq disguised and concealed his intent to establish a contract for recruiting services by repeatedly and falsely representing that his sole purpose in meeting with Clinton Group would be to solicit investment funding for a start-up hedge fund to be managed by his team.

114.   Clinton Group extended its employment offer to the QML IM team members in reliance on de Quillacq's multiple misrepresentations.

115.   But for de Quillacq's misrepresentations at the pitch meetings that his sole purpose was to solicit investment funding for a start-up hedge fund to be managed by his team, Clinton Group would not have extended an employment offer to any member of the QML IM team.

116.   But for de Quillacq's misrepresentations at the pitch meetings that his sole purpose was to solicit investment funding for a start-up hedge fund to be managed by his team, Clinton Group would not have entered any employment agreement with any member of the QML IM team in any capacity.

117.   Clinton Group was fraudulently induced by de Quillacq's various misrepresentations in email communications and at pitch meetings, as specifically detailed herein, to enter into employment contracts with QML IM team members.

118.   Clinton Group justifiably relied on de Quillacq's representation that he

was seeking investment funding for the QML IM team, not placement fees for Navesink, in extending employment offers to QML IM team members.

119. Clinton Group justifiably relied on de Quillacq's representation that he was seeking investment funding for the QML IM team, not placement fees for Navesink, to enter into employment contracts with QML IM team members.

120. Clinton Group's reliance was justified by industry standard recruiting practices, of which it was aware when it extended the July 7, 2017 employment offer to the QML IM team members.

121. As a result of de Quillacq's misrepresentations, all of which were made for and on behalf of, and with actual agency authority invested in it by, Defendant Navesink International LLC, Clinton Group was injured to the extent of all legal fees and expenses incurred in defending against Navesink's baseless and wrongful lawsuit, Index 654722/2018, in which Navesink sought placement fees, alleging that because Clinton Group received de Quillacq's emails with a tiny hyper-link at the bottom, it had a contractual obligation to pay such fees.

122. The injuries inflicted on Clinton Group by Defendants did not arise from a breach of the employment contracts entered into by Clinton Group with the QML IM Team members.

123. None of the QML IM Team members breached any term of employment with the Clinton Group.

124. The employment contracts entered into by Clinton Group with the QML IM Team members have no term related to payment of placement fees.

125. Clinton Group seeks damages against Defendants for $133,728 and for punitive damages in an amount to be determined at trial.

## SECOND CAUSE OF ACTION
## <u>THIRD-PARTY TORT</u>
(Against de Quillacq)

126.   Plaintiff repeats and realleges Paragraphs 1 through 101, inclusive, and 103 through 120, inclusive, and 122 through 125, inclusive, as if the same were fully set forth at length herein.

127.   Upon information and belief, Defendant Navesink at all relevant times maintained high ethical standards in the recruiting industry, including adhering to standard industry practice requiring that it explicitly negotiate placement fee agreements.

128.   Upon information and belief, Defendant Navesink at all relevant times maintained high ethical standards in the recruiting industry, including adhering to standard industry practice requiring that it memorialize fee agreements in a writing executed by all parties.

129.   Upon information and belief, Defendant Navesink did not authorize de Quillacq to make misrepresentations or engage in deceptive misconduct concerning his purpose in seeking and conducting meetings with the Clinton Group.

130.   Upon information and belief, Defendant Navesink did not authorize de Quillacq, at any time or manner relevant to the conduct complained of herein, to violate its practice of explicitly negotiating placement fee agreements.

131.   Upon information and belief, Defendant Navesink did not authorize de Quillacq, at any time or manner relevant to the conduct complained of herein, to violate its practice of memorializing fee agreements in a writing executed by all parties.

132.   Defendant Navesink is not owned by de Quillacq.

133.   Defendant Navesink is not controlled by de Quillacq.

134.   Clinton Group was required to defend its economic interests in litigation brought against it by Navesink in New York State Supreme Court, Index Number 654722/2018.

135.   Navesink alleged in Index Number 654722/2018 that Clinton Group had entered into a "Fee Agreement" covering the employment contracts into which it entered with QML IM team members.

136.   But for de Quillacq's fraudulent misrepresentations and deceptive misconduct as detailed herein, Clinton Group would have been aware of Navesink's standard form fee agreement.  As a result of that awareness, Clinton Group would have ended all discussions with de Quillacq and Navesink.

137.   But for de Quillacq's fraudulent misrepresentations and deceptive misconduct as detailed herein, Clinton Group would not have been required to act to protect its economic interests by defending against Index Number 654722/2018, brought by Navesink.

138.   Clinton Group was damaged in the amount of $133,728 in legal fees and expenses as a result of being required to protect its economic interests by defending against Index Number 654722/2018, brought by Navesink.

139.   Clinton Group is therefore entitled to recover against de Quillacq personally the reasonable value of attorneys' fees and other expenses it suffered and incurred in protecting its economic interest by defending against Index Number 654722/2018, brought by Navesink.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff Clinton Group demands judgment on its First Cause of Action stated herein against Defendants jointly and severally for: 1) $133,728 in compensatory damages; 2) punitive damages to be determined upon the trial of this action, and; 3) interest and such other relief as is appropriate under the law; and, Plaintiff Clinton Group demands judgment on its Second Cause of Action stated herein against Defendant de Quillacq individually for: 1) $133,728 in compensatory damages; 2) punitive damages to be determined upon the trial of this action, and; 3) interest and such other relief as is appropriate under the law.

Dated:          New York, New York
                July 10, 2024

Yours, etc.,

Wylie M. Stecklow
Jon Avins
WYLIE STECKLOW PLLC
Carnegie Hall Tower
152 W. 57th Street, 8th Floor
New York, NY 10019
(212) 566 8000