**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| CLINTON GROUP, INC. | |
| Plaintiff, | |
| v. | Case No. 1:24-cv-05195 |
| GONTRAN DE QUILLACQ, an individual, and NAVESINK INTERNATIONAL, LLC, | |
| Defendants. | |

**DEFENDANTS' L.R. 56.1 CORRECTED RESPONSES TO PLAINTIFF'S STATEMENT OF MATERIAL FACTS AS TO WHICH THERE IS NO GENUINE ISSUE TO BE TRIED AND COUNTER STATEMENT OF MATERIAL FACTS AS TO WHICH THERE IS NO GENUINE ISSUE TO BE TRIED**

Defendants Gontran de Quillacq ("Mr. de Quillacq") and Navesink International, LLC ("Navesink International") (collectively, "Defendants") respectfully submit their Rule 56.1 Statement in support of their Opposition to Plaintiff, Clinton Group, Inc.'s ("Plaintiff") Motion for Summary Judgment and Cross-Motion for Summary Judgment filed concurrently herewith.

**DEFENDANTS' L.R. 56.1 RESPONSES TO PLAINTIFF'S STATEMENT OF MATERIAL FACTS AS TO WHICH THERE IS NO GENUINE ISSUE TO BE TRIED**

1.      In 2018, Navesink International, LLC ("Navesink"), defendant in this action, sued Clinton Group, Inc., plaintiff in this action, in the Supreme Court of the State of New York, New York County, under Index Number 654722/2018 (the "State Court Action") "seeking payment from [] Clinton Group for executive recruitment services."

See: Stecklow Exh. A: State Court MSJ Decision & Order, CGI 0001- 0004, at 0001-02.

**RESPONSE:** Defendants admit each and every fact contained in paragraph 1 of Plaintiff's Statement of Material Facts.

*See*: Stecklow Exh. A: State Court MSJ Decision & Order, CGI 0001- 0004, at

0001-02.

2.      The State Court Action included causes of action for quantum meruit and unjust enrichment.

See: <u>Stecklow Exh. A</u>: State Court MSJ Decision & Order, CGI 0001- 0004, at 0003.

**RESPONSE:** Defendants admit each and every fact contained in paragraph 2 of Plaintiff's Statement of Material Facts.

*See*: <u>Stecklow Exh. A</u>: State Court MSJ Decision & Order, CGI 0001- 0004, at 0003.

3.      On April 5, 2024, the Supreme Court of the State of New York, New York County, issued it Decision & Order on Clinton Group's Motion for Summary Judgment, dismissing all of Navesink's causes of action and ordering entry of judgement in favor of Clinton Group.

*See*: <u>Stecklow Exh. A</u>: State Court MSJ Decision & Order, at CGI 0001.

**RESPONSE:** Defendants admit each and every fact contained in paragraph 3 of Plaintiff's Statement of Material Facts.

*See*: <u>Stecklow Exh. A</u>: State Court MSJ Decision & Order, CGI 0001- 0004, at CGI 0003.

4.      Using the summary judgment standard, in analyzing the quantum meruit and unjust enrichment causes of action, the court in the State Action determined and found as a fact that: "Navesink's email communications demonstrate that Navesink approached Clinton, as a potential investor, not as a recruiter."

*See*: <u>Stecklow Exh. A</u>: State Court MSJ Decision & Order, at CGI 0003.

**RESPONSE:** Defendants deny the facts contained in paragraph 4 of Plaintiff's Statement of Material Facts. Specifically, Defendants deny Plaintiff's interpretation of the state court decision and order.


*See*: Stecklow Exh. A: State Court MSJ Decision & Order, CGI 0003.

5.      On March 24, 2017, Mr. de Quillacq emailed Clinton Group to introduce himself. de Quillacq testified that he did not use an email address that identified him as a recruiter, "because when you see recruiter for whatever reason people are not interested in talking to recruiters."

*See*: Stecklow Exh. B: de Quillacq Tr., at 76:20 – 77:10.

**RESPONSE:** Defendants admit the facts contained in paragraph 5 of Plaintiff's Statement of Material Facts and emphasize that Mr. de Quillacq used a different email address for the March 24, 2022, communication to introduce both himself personally as well as the QML team, which was "looking for a long-term partner to launch an activity". Using his personal email address made more sense because:

> When [they] were at Salt Creek at the follow-up of these [*sic*] e-mail ... [he] explain [*sic*] clearly that [he] was coming and introducing that team as a recruiter and, therefore, [he] would from now on use [his] recruiter's e-mail that has a disclaimer and a contract attached. [He] stated it extremely clearly during that Salt Creek conversation .... [They] are setting up this conversation so that [he] can have a discussion with them and introduce [himself] as a recruiter then. Why, because when you see recruiter, for whatever reason, people are not interested in talking to recruiters. When [he has] shown that [he is] highly competent, they are willing to talk to [him], and now [he] can introduce the team as an executive recruiter, which is what [he] did with their agreement.

*See*: Stecklow Exh. B: de Quillacq Tr., at 76:20 – 77:14; Boyle Exh. K, March 24, 2017, email from Gontran de Quillacq to Peter Rawlins, at TCG 000012.

6.      The court in the State Action determined and found as a fact that: "Navesink's email communications . . . dated March 30, 2017, plainly states that Gontran 'would like to introduce [QML] to [Clinton] for **Investment consideration**'" [emphasis added by State court].

*See*: Stecklow Exh. A: State Court MSJ Decision & Order, at CGI 0003.

**RESPONSE:** Defendants deny the facts contained in paragraph 6 of Plaintiff's Statement of Material Facts. Specifically, Defendants deny Plaintiff's interpretation of the state court decision and order.

*See*: Stecklow Exh. A: State Court MSJ Decision & Order, at CGI 0003.

7.      On March 30, 2017, de Quillacq emailed Plaintiff. He began his email with the statement: "We would like to introduce QML IM to Glassbridge / The Clinton Group for investment consideration." He concluded the email with the statement: "We look forward to the opportunity of answering any question you may have at your earliest convenience."

*See*: Stecklow Exh. C: March 30, 2017 email, at Navesink 000069.

**RESPONSE:** Defendants admit each and every fact contained in paragraph 7 of Plaintiff's Statement of Material Facts.

*See*: Stecklow Exh. C: March 30, 2017 email, at Navesink 000069.

8.      In the sentence immediately following its finding of fact that Navesink "plainly state[d]" that de Quillacq was seeking an introduction "for **Investment consideration**," [emphasis added by State court], the court in the State Action held that Navesink's quantum meruit and unjust enrichment causes of action "are dismissed because Navesink fail[ed] to offer evidence of its reasonable expectation of compensation for recruitment services." The State court did not cite or consider any other fact or factual issue as a basis for dismissal of the quantum meruit and unjust enrichment causes of action, or in analyzing those causes of action.

*See*: Stecklow Exh. A: State Court MSJ Decision & Order, at CGI 0003-04.

**RESPONSE:** Defendants deny the facts contained in paragraph 8 of Plaintiff's Statement of Material Facts. Specifically, Defendants deny Plaintiff's interpretation of the state court decision and order.

*See*: <u>Stecklow Exh. A</u>: State Court MSJ Decision & Order, at CGI 0003-04.

9.     The QML team that de Quillacq had introduced for "investment consideration" in his March 30 email met with Clinton Group "several times, three or four times," testified Sorin Alexe, the Portfolio Manager in the QML team. Clinton Group "wanted a presentation, they want another presentation."

*See*: <u>Stecklow Exh. D</u>: Alexe Tr., at 34:21–35:9.

**RESPONSE:** Defendants admit the facts in paragraph 9 of Plaintiff's Statement of Material Facts and emphasize that the QML team was introduced via the email address, Recruiters@Navesink.com which contained resumes with an "Executive Recruitment" banner.

*See*: <u>Stecklow Exh. C</u>: March 30, 2017 email, at Navesink 000069.

10.     In each of those several meetings, de Quillacq "presented our pitch, and we are asking for money and we want to manage that as a team."

*See*: <u>Stecklow Exh. D</u>: Alexe Tr., at 23:17-24.

**RESPONSE:** Defendants admit the facts in paragraph 10 of Plaintiff's Statement of Material Facts and emphasize that the QML team was introduced via the email address, Recruiters@Navesink.com which contained resumes with an "Executive Recruitment" banner.

*See*: <u>Stecklow Exh. D</u>: Alexe Tr., at 23:17-24; <u>Stecklow Exh. C</u>: March 30, 2017 email, at Navesink 000069.

11.     In its opposition to summary judgment in the State Court Action, Navesink admitted each of the specific facts testified to by Mr. Alexe and cited above in Paragraphs 9 and 10.

*See*: <u>Stecklow Exh. E</u>: Navesink's State Court Fact Response, at CGI-000162, ¶ 42 Response.

**RESPONSE:** Defendants deny the facts in paragraph 11 of Plaintiff's Statement of Material Facts. Navesink International admitted the facts in paragraph 42 of Clinton Group's Statement of Material Facts in the state court action and emphasized that the that "the team was introduced via email which contained resumes with Recruiter banner".

*See*: <u>Stecklow Exh. E</u>: Navesink's State Court Fact Response, at CGI-000162, ¶ 42 Response.

12.    Following the QML team's first of several pitch meetings with Clinton Group, de Quillacq told Mr. Alexe that Clinton Group might not provide the investment funding they were seeking. de Quillacq then told Mr. Alexe that "if we don't get funded, our partnership, and he said that this might happen, and then he said that he will act as a recruiter."

*See*: <u>Stecklow Exh. D</u>: Alexe Tr., at 25:11 – 26:18.

**RESPONSE:** Defendants admit the facts in paragraph 12 of Plaintiff's Statement of Material Facts for they correctly refer back to the original three proposals sent by Plaintiff by e-mail before Clinton Group began engaging in the relationship with the QML team.

*See*: <u>Boyle Exh. A</u>: de Quillacq Tr., at 62:9-12.

13.    In its opposition to summary judgment in the State Court Action, Navesink admitted each of these specific facts testified to by Mr. Alexe and cited above in ¶ 12.

*See*: <u>Stecklow Exh. E</u>: Navesink's State Court Fact Response, at CGI-000163-164, ¶ 45 Response.

**RESPONSE:** Defendants deny the facts in paragraph 13 of Plaintiff's Statement of Material Facts. Navesink International admitted the facts in paragraph 45 of Clinton Group's Statement of Material Facts in the state court action and stated that "they correctly refer back to the original three proposals sent by Plaintiff by e-mail before the Clinton Group began engaging in this relationship."

*See*: Stecklow Exh. E: Navesink's State Court Fact Response, at CGI-000163-164, ¶ 45 Response.

14.    Mr. Alexe discussed with de Quillacq the possibility of Clinton Group not taking the whole team. Mr. Alexe testified that de Quillacq "said that if he is going to be out of this relationship he is going to ask Clinton Group to pay for that introduction."

*See*: Stecklow Exh. D: Alexe Tr., at 24:3-6; Stecklow Exh. E: Navesink's State Court Fact Response, at CGI-000164, ¶ 46 Response.

**RESPONSE:** Defendants admit the facts in paragraph 14 of Plaintiff's Statement of Material Facts for they correctly refer back to the original three proposals sent by Plaintiff by e-mail before Clinton Group began engaging in the relationship with the QML team.

*See*: Boyle Exh. A: de Quillacq Tr., at 62:9-12.

15.    In its opposition to summary judgment in the State Court Action, Navesink admitted each of these specific facts testified to by Mr. Alexe and cited above in ¶ 14.

*See*: Stecklow Exh. E: Navesink's State Court Fact Response, at CGI-000164, ¶ 46 Response.

**RESPONSE:** Defendants deny the facts in paragraph 15 of Plaintiff's Statement of Material Facts. Navesink International admitted the facts in paragraph 46 of Clinton

Group's Statement of Material Facts in the state court action and stated that "they correctly refer back to the original three proposals sent by Plaintiff by e-mail before the Clinton Group began engaging in this relationship."

*See*: <u>Boyle Exh. A</u>: de Quillacq Tr., at 62:9-12.

16.      Mr. Alexe testified that although "[i]n the meetings with Clinton, no," de Quillacq did not mention a recruitment fee, "in a personal meeting with Mr. de Quillacq he mentioned something like" it.

*See*: <u>Stecklow Exh. D</u>: Alexe Tr., at 63:2 – 64:21.

**RESPONSE:** Defendants admit the facts contained in paragraph 16 of Plaintiff's Statement of Material Facts and deny the implication that Mr. de Quillacq and Clinton Group did not discuss recruitment fees in any meetings. At the Salt Creek meeting Mr. de Quillacq explicitly mentioned his status as executive recruiter, agreed with Robert Picard that he would be entitled to a recruitment fee and that going forward he would exchange e-mails with Clinton Group representatives using his recruiter e-mail with a disclaimer which outlined that should there be no contract Navesink's default legal terms would apply. The Clinton Group representatives, authorized by the CEO, George Hall, were all aware, and Mr. Alexe, the candidate did not need to know the details regarding any placement fees between a recruitment firm and its client.

*See*: <u>Boyle Exh. B</u>: Picard Tr., 20:20-21; <u>Boyle Exh. A</u>: de Quillacq Tr., at 179:1-23.

17.      Navesink did not attempt to contravene these specific facts, as testified to by Mr. Alexe, in its opposition to summary judgment in the State Court Action.

*See*: <u>Stecklow Exh. E</u>: Navesink's State Court Fact Response, at 000162-163, ¶ 43 Response.

**RESPONSE:** Defendants deny the facts contained in paragraph 17 of Plaintiff's Statement of Material Facts. Navesink International explicitly denied the facts contained in paragraph 43 of Clinton Group's Statement of Material Facts in the state court action.

*See*: Stecklow Exh. E: Navesink's State Court Fact Response, at 000162-163, ¶ 43 Response.

18.     At all relevant times, de Quillacq was the Managing Partner of Defendant Navesink, LLC. He testified that: "I am the managing partner." He also testified that: "At the end, me and Navesink is pretty much the same thing because it's owned by my wife, but we are married and so it's kind of the same thing, yes."

*See*: Stecklow Exh. B: de Quillacq Tr., at 235:16-19; 236:16-19.

**RESPONSE:** Defendants admit the facts contained in paragraph 18 of Plaintiff's Statement of Material Facts.

*See*: Stecklow Exh. B: de Quillacq Tr., at 235:16-19; 236:16-19.

19.     Navesink's submissions in the State Court Action consistently refer to de Quillacq personally as the "Plaintiff" in that action, e.g., "Plaintiff admits that he ceased recruiting activities when Defendant [Clinton Group] asked him to." [emphasis added.]

*See*: Stecklow Exh. E: Navesink's State Court Fact Response, at 000162-64, 000168-176, 178, 182, 184-186 (Responses to: ¶¶ 7 [quoted above], 43, 47, 53-54, 57-58, 60, 62-65, 67, 70, 79, 83, 86).

**RESPONSE:** Defendants admit the facts contained in paragraph 19 of Plaintiff's Statement of Material Facts.

*See*: Stecklow Exh. E: Navesink's State Court Fact Response, at 000162-64, 000168-176, 178, 182, 184-186 (Responses to: ¶¶ 7 [quoted above], 43, 47,

53-54, 57-58, 60, 62-65, 67, 70, 79, 83, 86).

20.    In July 2017, Clinton Group offered employment positions to the QML team members.

*See*: <u>Stecklow Exh. F</u>: Hall Depo Tr., at 57:7-12.

**RESPONSE:** Defendants admit the facts contained in paragraph 20 of Plaintiff's Statement of Material Facts and emphasizes that the employment was never formalized with an employment contract.

*See*: <u>Stecklow Exh. F</u>: Hall Depo Tr., at 57:7-12; <u>Boyle Exh. J</u>, Employment Offer, at Sorin 000003.

21.    After Clinton Group proposed to hire the QML team as employees, de Quillacq did not send a recruiting contract to Clinton Group. de Quillacq testified that he did not do so because if he had Clinton might have declined to hire the team, and "because my placement fee increases over time and it increases about three months which, you know . . . [i]t is rational."

*See*: <u>Stecklow Exh. B</u>: de Quillacq Tr., at 217:15–218: 19.

**RESPONSE:** Defendants deny the facts contained in paragraph 21 of Plaintiff's Statement of Material Facts as stated. Mr. de Quillacq testified that he did not send a separate recruiting contract to Clinton Group because:

> A, [we] never had an employment contract. B, because [Navesink International's] placement fee increase over time and it increases about three months which, you know -- where I certainly was let go. So there's plenty of reason for [them] not to ask for the placement fees. It is rational.

Furthermore, when counsel for Clinton Group asked whether he did not send a fee agreement because he did not want them to fire him and not hire these people until his fee

10

would increase over time, Mr. de Quillacq responded "[n]o. They already had the fee agreement".

*See*: Stecklow Exh. B: de Quillacq Tr., at 217:15–218:25.

22.    Navesink did not attempt to contravene these specific facts in its opposition to summary judgment in the State Court Action, but instead specifically reaffirmed that de Quillacq "did not send a recruiting contract at that time . . . for the following reason: . . . the fee increases over time as the months pass by. So if I was claiming my placement fee they could have stopped the hiring immediately and said goodbye Gontran . . . we owe you nothing, and, therefore, it made sense not to claim."

*See*: Stecklow Exh. E: Navesink's State Court Fact Response, at 000177-178, ¶ 70 Response.

> **RESPONSE:** Defendants deny the facts contained in paragraph 22 of Plaintiff's Statement of Material Facts as stated. Navesink International responded as follows:
>
>> [Navesink International] admits the allegation contained in paragraph 70 of [Clinton Group's] Statement of Material Facts as to not having sent a recruiting contract at that time, but denies the allegations contained in paragraph 70 as to the why he did not do so then. [Mr. de Quillacq] testified he did not send a recruiting contract at that time for the following reasons: "The first one is those employees didn't have a contract. So we never knew exactly when we started. We were supposed to have a contract. They lured us a contract. Sorin Alexe, who was representing me now when I was in there was telling me that, you know, we would have a contract, but we never had a formal contract, which means their start date is not too obvious, and the contractual agreement specifies that the fee increases over time as the months pass by. So if I was claiming my placement fee they could have stopped the hiring immediately…Second, I came in good faith…and because I was looking forward to a long-term relationship with Clinton that would have been worth much more than the placement fee I did not at that time make my claim. When it turns out that Clinton had been in bad

faith, on that day where I was let go out of nowhere, I said in that case I am requesting my placement fee. I was entitled to it.".

*See*: <u>Stecklow Exh. E</u>: Navesink's State Court Fact Response, at 000177-178, ¶ 70 Response.

23.     The first time de Quillacq "discussed and requested a claim for the placement fee [was] in my separation interview" in November, 2017.

*See*: <u>Stecklow Exh. B</u>: de Quillacq Tr., at 128:4 – 129:10; 135:3-8; 161:6-13.

**RESPONSE:** Defendants deny the facts contained in paragraph 23 of Plaintiff's Statement of Material Facts as stated. Defendants admit the date of the separation interview, but deny that this was the first claim for a placement fee as Clinton Group was made aware of the placement fee since the first meeting at Salt Creek and the first e-mail introducing the team. Mr. de Quillacq advised of the recruiter's fee owed at the Salt Creek meeting and via terms in his e-mail exchanges through Recruiters@Navesink.com.

*See* <u>Stecklow Exh. B</u>, de Quillacq Tr., Tr., 77:6-14.

24.     de Quillacq testified that "it's unusual" for a member of a team to also act as a recruiter for the team, and that he had never done so before this instance.

*See*: <u>Stecklow Exh. B</u>: de Quillacq Tr., at 236:20 – 237:8.

**RESPONSE:** Defendants admit the facts contained in paragraph 24 of Plaintiff's Statement of Material Facts and emphasize that when asked about possible ethical restrictions as to the unusual nature of acting as member and recruiter for the team, Mr. de Quillacq testified: "Not that I know of."

*See:* <u>Stecklow Exh. B</u>: de Quillacq Tr., at 236:20 – 237:8.

25.     Navesink did not attempt to contravene these specific facts in its opposition to summary judgment in the State Court Action.

*See*: Stecklow Exh. E: Navesink's State Court Fact Response, at 000184, ¶ 83 Response.

**RESPONSE:** Defendants deny the facts contained in paragraph 25 of Plaintiff's Statement of Material Facts. Navesink International responded to these specific facts as follows:

> [Navesink International] denies the allegations contained in paragraph 83 of [Clinton Group's] Statement of Material Facts in that they mischaracterize his testimony. ... [W]hen asked about possible ethical restrictions as to the unusual nature of acting as member and recruiter for the team, Plaintiff testified: "Not that I know of."

*See*: Stecklow Exh. E: Navesink's State Court Fact Response, at 000184, ¶ 83 Response.

26.    In making the offer of employment, Clinton Group's CEO George Hall "relied on the fact that the only thing we discussed was investing or whether or not we would basically put them under our umbrella to try to use their trading strategy." Mr. Hall would not have offered employment to the team if he had known that a recruiting fee would be expected as a result.

*See*: Stecklow Exh. F: Hall Depo Tr., 55:19-56:5, 54:4-24.

**RESPONSE:** Defendants admit that Mr. Hall provided the testimony contained in paragraph 26 of Plaintiff's Statement of Material Facts. Defendants deny the facts contained in paragraph 26 of Plaintiff's Statement of Material Facts. Mr. Hall was aware that Mr. de Quillacq was a recruiter and that a recruiting fee for placement was contemplated and Clinton Group offered employment to the QML team with that knowledge.

*See:* Stecklow Exh. C: March 30, 2017 email, at Navesink 000069; Boyle Exh. G: March 24, 2017, Text Messages between Robert Picard and George Hall, at PICARD000046;

Boyle Ex. H: April 13, 2017, email from Robert Picard to Peter Rawlins, at TCG – 000213.

27.    Mr. Hall testified by Affidavit that "[t]he initial meetings were held at de Quillacq's request, to ask Clinton to consider investing in a start-up hedge fund company he called QML. Later discussions revolved around whether or not the QML team could operate using existing Clinton capital."

*See*: Stecklow Exh. G: Exh. 9 to Hall Depo. Tr. ("Hall Affidavit"), at ¶ 3.

**RESPONSE:** Defendants admit that Mr. Hall provided the statements contained in paragraph 27 of Plaintiff's Statement of Material Facts in an affidavit. Defendants deny the facts stated in paragraph 27 of Plaintiff's Statement of Material Facts. Mr. Hall was aware that Mr. de Quillacq was a recruiter and that a recruiting fee for placement was contemplated. Furthermore, Mr. de Quillacq and Clinton Group had many discussions in which they discussed employment of the QML team, the fact that Mr. de Quillacq was a recruiter, and that recruitment fees would apply with a placement of the QML team. As a result of these discussions, Clinton Group offered employment to the QML team and Mr. de Quillacq was tasked with obtaining funding for the QML team outside of Clinton Group.

*See:* Stecklow Exh. C: March 30, 2017 email, at Navesink 000069; Boyle Exh. B: Picard Tr., 20:20-21; Boyle Exh. A: de Quillacq Tr., at 179:1-23; Boyle Exh. C: Alexe Tr. 51:10-52:6, 47:10-48:10; Boyle Exh. G: March 24, 2017, Text Messages between Robert Picard and George Hall, at PICARD000046; Boyle Ex. H: April 13, 2017, email from Robert Picard to Peter Rawlins, at TCG – 000213.

28.     Clinton Group had used recruiters from time to time to conduct executive searches to locate, interview, and potentially bring people on board for certain professional positions. In the course of Clinton Group's experience working with recruiters, the recruiter would identify themselves as recruiters in their initial phone calls or contact with Clinton Group, and they would discuss fees during those initial calls or contacts.

*See*: Stecklow Exh. F: Hall Depo Tr., at 50:10-19, 55:1-18.

**RESPONSE:** Defendants are without sufficient information to admit or deny the facts contained in paragraph 28 of Plaintiff's Statement of Material Facts. Defendants admit when asked "you state there that from time-to-time to conduct executive searches, interviews, and to bring people on board for certain professional positions, the Clinton Group would use recruiters, correct?", Mr. Hall answered with "[y]es". Furthermore, Defendants admit that when asked "[y]ou previously testified that in the normal course of working with recruiters, they would identify themselves as recruiters in their initial phone calls or contact, correct?", Mr. Hall answered with "[c]orrect". In further response, Mr. Hall testified that Clinton Group's prior interactions with recruiters were only in the context of proactive hiring where they would "reach out to a recruiter" and would specifically ask them to find what they are looking for and what the salary range might be.

*See:* Stecklow Exh. F: Hall Depo Tr., at 50:10-19, 55:1-22.

29.     In Clinton Group's past experience with recruiters, Clinton Group "generally tr[ied] to negotiate and get better fees," and "there would be an agreement as to what the fee was" before it hired an employee through a recruiter.

*See*: Stecklow Exh. F: Hall Depo Tr., at 52:1-9

**RESPONSE:** Defendants deny the facts contained in paragraph 29 of Plaintiff's Statement of Material Facts. Mr. Hall testified that "there are customary fees. We generally try to negotiate and get better fees, but before an employee was placed with us, there would be an agreement as to what the fee was."

*See:* Stecklow Exh. F: Hall Depo Tr., at 52:1-9.

30.    In the normal course of his activities as a recruiter, before placing a candidate with a company, de Quillacq prefers "having a contract, I want a contract" with the company, and "[he] would love to" have a contract, "but it's hard and not everybody gives one."

*See:* Stecklow Exh. B: de Quillacq Tr., at 240:9-22.

**RESPONSE:** Defendants deny the facts contained in paragraph 30 of Plaintiff's Statement of Material Facts. Mr. de Quillacq testified as follows:

> Q. When you're seeking to place somebody with a company as a recruiter, do you more often use signed agreements or verbal contracts?
>
> A. With the company, not always. I would love to, but it's hard and not everybody gives one and actually plenty of companies work without contract.
>
> Q. I'm asking you what you do more often. What is your practice more often? Do you more often use a signed agreement or more often do you do verbal?
>
> A. It's what the client wants. Depend on the client. I prefer with having a contract and I want to have a contract, and if I don't have a contract, I have a default contract in my disclaimer, which is binding and all the recruiters know -- all the clients know.

*See:* Stecklow Exh. B: de Quillacq Tr., at 240:9-25.

31.    Despite his preference and strong desire to have a contract with companies into which he places candidates, de Quillacq admitted that he never asked the Clinton Group for a recruiting contract.

*See*: <u>Stecklow Exh. B</u>: de Quillacq Tr., at 215:8-11.

**RESPONSE:** Defendants deny the facts contained in paragraph 31 of Plaintiff's

Statement of Material. Mr. de Quillacq did not need to ask for a recruiting contract

because Clinton Group had agreed to Navesink International's disclaimers and default

agreement.

*See*: <u>Stecklow Exh. B</u>: de Quillacq Tr., at 215:8-21.

32.     Navesink admitted the specific facts stated in Paragraph 32 above in its opposition

to summary judgment in the State Court Action.

*See*: <u>Stecklow Exh. E</u>: Navesink's State Court Fact Response, at 000161, ¶ 40

Response.

**RESPONSE:** Insofar as Plaintiff refers to the facts stated in paragraph 31 of its

Statement of Material Facts, Defendants deny the facts contained therein and deny the

facts contained in paragraph 32 of Plaintif's Statement of Material Facts. Navesink

International admitted the fact that when "[q]uestioned whether and when he asked the

Clinton Group for a recruiting contract, Mr. de Quillacq replied "I don't need to. The

disclaimers and our agreements, they agreed to it" and further denied the implication that

a written recruiting agreement was necessary to form a contract.

*See*: <u>Stecklow Exh. E</u>: Navesink's State Court Fact Response, at 000161, ¶ 40 Response.

33.     Clinton Group CEO Mr. Hall testified that "[t]he recruiting never came up and is,

frankly, mind boggling."

*See*: <u>Stecklow Exh. F</u>: Hall Tr., at 57:2-6.

**RESPONSE:** Defendants admit that Mr. Hall provided the testimony paragraph 33 of its

Statement of Material Facts. Defendants deny the facts contained therein. Mr. Hall was

aware that Mr. de Quillacq was a recruiter and that a recruiting fee for placement was contemplated and Clinton Group offered employment to the QML team with that knowledge.

*See:* <u>Stecklow Exh. C</u>: March 30, 2017 email, at Navesink 000069; <u>Boyle Exh. G</u>: March 24, 2017, Text Messages between Robert Picard and George Hall, at PICARD000046; <u>Boyle Ex. H</u>: April 13, 2017, email from Robert Picard to Peter Rawlins, at TCG – 000213.

34.    Clinton Group "would not use a recruiter when considering making an investment in a new firm such as the QML was, particularly when the principals of the new firm reached out to me and asked me to invest in and help get their firm started, as de Quillacq did." Plaintiff's CEO "relied on de Quillacq's false representation that he was solely approaching Clinton Group as a member of a team seeking start-up investment funding in the hedge fund industry when I offered the QML team employment at Clinton Group." Plaintiff would not have offered employment to any member of the QML team but for de Quillacq's misrepresentations regarding his purpose and intentions.

*See*: <u>Stecklow Exh. G</u>: Hall Affidavit, at ¶¶ 5, 7.

**RESPONSE:** Defendants deny the facts contained in paragraph 34 of Plaintiff's Statement of Material Facts. Mr. Hall was aware that Mr. de Quillacq was a recruiter and that a recruiting fee for placement was contemplated. Furthermore, Mr. de Quillacq and Clinton Group had many discussions in which they discussed employment of the QML team, the fact that Mr. de Quillacq was a recruiter, and that recruitment fees would apply with a placement of the QML team. As a result of these discussions, Clinton Group

offered employment to the QML team and Mr. de Quillacq was tasked with obtaining

funding for the QML team outside of Clinton Group.

*See:* Stecklow Exh. C, March 30, 2017, email, at Navesink 000069; Boyle Exh. B: Picard

Tr., 20:20-21; Boyle Exh. A: de Quillacq Tr., at 179:1-23; Boyle Exh. C: Alexe Tr. 51:10-

52:6, 47:10-48:10, 40:16-20; Boyle Exh. G: March 24, 2017, Text Messages between

Robert Picard and George Hall, at PICARD000046; Boyle Ex. H: April 13, 2017, email

from Robert Picard to Peter Rawlins, at TCG – 000213.

35.    In June of 2018, over six months Clinton Group had terminated de Quillacq's

employment, Mr. Hall received the first invoice from Navesink demanding payment of a

recruitment fee for the hiring of the QML team. He responded to the email with "something

along the lines of, I'll see you in court." Navesink then commenced the State Court Action,

demanding $350,000 in "damages."

*See*: Stecklow Exh. F: Hall Depo Tr., at 57:7-23.

**RESPONSE:** Defendants deny the facts contained in paragraph 35 of Plaintiff's

Statement of Material Facts. Mr. de Quillacq sought payment for a recruitment fee during

his separation interview in November of 2017. Navesink International made written

requests for payment in June of 2018. Mr. Hall responded to these written requests with:

"[a]nd we will take our next step as well. Good luck".

*See*: Stecklow Exh. B: de Quillacq Tr., at 128:4-17; Boyle Exh. D: email exchange

between Clinton Group and Erin Matey de Quillacq, at TCG – 000112.

36.    de Quillacq confirmed under oath that Navesink sued Clinton Group because

Clinton Group did not pay the claimed recruiting fee. "Well, why would we be here if they had

agreed to it" he testified in the State Court Action.

*See*: <u>Stecklow Exh. B</u>: de Quillacq Tr., at 242:15-19.

**RESPONSE:** Defendants deny the facts contained in paragraph 36 of Plaintiff's Statement of Material Facts. Mr. de Quillacq testified "[w]ell, why would we be here if they had agreed to it" when asked whether "Clinton agree[d] that this amount that [he] submitted was agreed upon and accepted as correct?". Mr. de Quillacq did not provide any testimony as to why Navesink International initiated the state court action against Clinton Group and Plaintiff fails to cite to an appropriate reference in the record.

*See*: <u>Stecklow Exh. B</u>: de Quillacq Tr., at 242:15-19.

37.    Plaintiff hired and paid attorneys to defend the State Court Action. Plaintiff first hired Quinn Emmanuel. Plaintiff incurred $92,566.96 in total legal fees and expenses due to Quinn Emmanuel for its representation defending the State Court Action. Plaintiff paid the full $92,566.96 in fees and expenses to Quinn Emmanuel by either check or wire transfer.

*See*: <u>Stecklow Exh. F</u>: Hall Depo Tr., at 58:19-59:2, 59:16–60:9; <u>Stecklow Exh</u>. H: Exh. 10 to Hall Depo. Tr., at CGI-0005, 0008, 0010, 0012, 0016.

**RESPONSE:** Defendants admit that Clinton Group retained attorney, Alex Spiro from the law firm Quinn Emanuel Urquhart & Sullivan, LLP, for its representation of Clinton Group in the state court action as well as an SEC Investigation. Defendants emphasize that Clinton Group's calculation of purported damages appears to include invoices related to an unrelated SEC matter. Defendants further emphasize that Clinton Group requested compensatory damages in the total amount of $133,728.00 resulting from attorneys' fees and expenses it allegedly incurred in the state court action.

*See*: <u>ECF 1</u>: Complaint, ¶ 87, Prayer for Relief; <u>Stecklow Exh. H</u>: Exh. 10 to Hall Depo. Tr., at CGI 0008, CGI 0010, CGI 0012, CGI 0016.

38.     In an attempt to reduce the cost of defending the State Court Action, Plaintiff changed counsel during the litigation, retaining Wylie Stecklow PLLC. Plaintiff incurred $150,350 in total legal fees and expenses due to Wylie Stecklow PLLC for its representation defending the State Court Action. Plaintiff paid the full $150,350 in fees and expenses to Wylie Stecklow PLLC by wire transfer.

> *See*: <u>Stecklow Exh. E</u>: Hall Depo Tr., at 60:12-25, 61:18-62:7; <u>Stecklow Exh. I</u>: Exh. 11 to Hall Depo. Tr., at CGI-0017-0022, 0023-30, 0031-39, 0040-43, 0044-45, 0046-48, 0049, 0050-54, 0055-56.

> **RESPONSE:** Defendants admit that Clinton Group retained the law firm of Wylie Stecklow PLLC for its representation in the state court action. Defendants emphasize that Clinton Group requested compensatory damages in the total amount of $133,728.00 resulting from attorneys' fees and expenses it allegedly incurred in the state court action.
>
> *See*: <u>ECF 1</u>: Complaint, ¶ 87, Prayer for Relief.

39.     Plaintiff paid an invoice in the amount of $1,520.60 directly to Bee Reporting Agency for a deposition transcript and stenographic court reporting services it provided related to the deposition of de Quillacq in the State Court Action.

> *See*: <u>Stecklow Exh. F</u>: Hall Depo Tr., at 62:21-63:24; <u>Stecklow Exh. J</u>: Exh. 12 to Hall Depo. Tr., at CGI-57-58.

> **RESPONSE:** Defendants admit the facts contained in paragraph 39 of Plaintiff's Statement of Material Facts. Defendants emphasize that Clinton Group requested compensatory damages in the total amount of $133,728.00 resulting from attorneys' fees and expenses it allegedly incurred in the state court action.
>
> *See*: <u>ECF 1</u>: Complaint, ¶ 87, Prayer for Relief.

## DEFENDANTS' L.R. 56.1 COUNTER-STATEMENT OF MATERIAL FACTS AS TO WHICH THERE IS NO GENUINE ISSUE TO BE TRIED

40.    Navesink International is an executive recruitment and award-winning expert witness company for the financial industry.

*See*: <u>Boyle Exh. E</u>: Screenshot of Navesink International's website, at Navesink 1106.

41.    The March 30, 2017, email, Mr. de Quillacq sent to Robert Picard and Peter Rawlins included the following attachments: resumes for each member of the QML team, a PowerPoint introduction, and a document explaining the US Top 1200A strategy.

*See*: <u>Stecklow Exh. C</u>: March 30, 2017 email, at Navesink 000069.

42.    The March 30, 2017, email, Mr. de Quillacq sent to Robert Picard and Peter Rawlins also included the following: a disclaimer stating "[u]nless we have a contract in place, you agree to our legal terms" and a link to the legal terms on Navesink International's website; a banner stating "Navesink International Executive Recruitment"; and was sent from the email address "Recruiters@NavesinkInternational.com".

*See*: <u>Stecklow Exh. C</u>: March 30, 2017 email, at Navesink 000069.

43.    The legal terms on Navesink International's website, provide, *inter alia*, that the Clinton Group "engages Navesink Int. to refer candidates to fill positions for employment or business relations" and that Clinton Group would be responsible for the payment of a certain referral fee. Clinton Group accessed the Navesink website and its default contract multiple times during the relevant period of time.

*See*: <u>Boyle Exh. E</u>: Screenshot of Navesink International's website, Legal Terms, at Navesink 1107; <u>Boyle Exh. F</u>: Navesink Fee Agreement, at Navesink 1727; <u>Boyle Exh. N</u>: Screenshot of Statistics for Navesinkinternational.com, at Navesink 001203-001204.

44.    On March 24, 2017, Robert Picard sent the following text message to George

Hall: "... I met with Gontran de Quillacq 4 months ago in RedBank when basing GlassBridge in

NJ was still contemplated. He's also a recruiter and it sounds like he may have a team to place at

Clinton. We could see him again for Clinton needs...".

See: <u>Boyle Exh. G</u>: March 24, 2017, Text Messages between Robert Picard and George

Hall, at PICARD000046.

45.    On April 13, 2017, Robert Picard sent the following email to Peter Rawlins: "I

figured we would review the strategy/team and if it gets serious take a deeper dive. He's only the

Biz Dev guy and/or Recruiter.

See: <u>Boyle Exh. H</u>: April 13, 2017, email from Robert Picard to Peter Rawlins, at TCG –

000213.

46.    In April of 2017, Peter Rawlins was the head of operations for Clinton Group and

worked closely with George Hall.

See: <u>Boyle Exh. I</u>: Hall Tr., at 36:17-21.

47.    Clinton Group terminated Mr. de Quillacq's employment in November of 2017.

See: <u>Boyle Exh. A</u>: Gontran Tr., at 128:24-129:10.

48.    During his departure meeting, in November of 2017, Mr. de Quillacq requested a

recruitment fee from Clinton Group.

See: <u>Boyle Exh. A</u>: Gontran Tr., at 128:24-129:10.

49.    On June 22, 2018, July 22, 2018, and August 27, 2018, Navesink International

owner, Erin Matey de Quillacq, sent emails to Clinton Group demanding payment of a

recruitment fee for the hiring of the QML team. On August 27, 2018, Mr. Hall responded to

Ms. de Quillacq's most recent email with "And we will take our next step as well. Good luck."

*See*: <u>Boyle Exh. D</u>: email exchange between Clinton Group and Erin Matey de Quillacq, at TCG – 000112-113.

50.     Sorin Alexe remained employed with Clinton Group until sometime in 2019 when Clinton Group could no longer afford to pay his salary.

*See*: <u>Boyle Exh. C</u>, Alexe Tr., at 8:11-17, 50:13-23.

51.     On March 24, 2017, Mr. de Quillacq sent an email to Peter Rawlins outlining "a few business proposals", including "[a] team [he] belong[s] to is looking for a long-term partner to launch an activity".

*See*: <u>Boyle Exh. K</u>, March 24, 2017, email from Gontran de Quillacq to Peter Rawlins, at TCG 000012.

52.     On July 25, 2017, Gontran de Quillacq sent the following email to George Hall:

> ... Nader suggest [*sic*] that I reach out to you regarding my company, Navesink International LLC, and its its [*sic*] future operations while I am an employee of Clinton Group. Navesink International LLC is a small consulting company, 100% owned by my spouse, an HR professional. It has no investment activities, only the following businesses, which I would like to retain in a much lower degree:
>
> **<u>Due diligence of investment personal [*sic*] and their strategies</u>**, for the purpose of investment/employment. ... This being said, working with senior professionals can bring solid networking benefits occasionally and constitutes a valuable source of market knowledge. Both will be beneficial to Clinton and I would therefore like the right to introduce a candidate/strategy on an exceptional basis ....

*See*: <u>Boyle Exh. L</u>, July 25, 2017, email from Gontran de Quillacq to George Hall, at TCG – 000018.

53.     On February 13, 2018, Mr. de Quillacq sent the following email to Mr. Hall: "Several weeks ago, you requested an in-person meeting with me to introduce interesting candidates".

*See*: <u>Boyle Exh. M</u>, February 13, 2018, email from Gontran de Quillacq to George Hall, at TCG – 000096.

54.     Mr. de Quillacq testified that he emailed Clinton Group, on March 24, 2017, to "set[] up this conversation so that [he] can have a discussion with them and introduce [himself] as a recruiter then. Why, because when you see recruiter, for whatever reason, people are not interested in talking to recruiters. When [he has] shown that [he is] highly competent, they are willing to talk to [him], and now [he] can introduce the team as an executive recruiter, which is what [he] did with their agreement."

*See*: <u>Stecklow Exh. B</u>: de Quillacq Tr., at 76:20 – 77:14.

55.     Mr. de Quillacq testified that when he, the QML team and representatives from Clinton Group met "at Salt Creek ... [he] explain [*sic*] clearly that [he] was coming and introducing that team as a recruiter and, therefore, [he] would from now on use [his] recruiter's e-mail that has a disclaimer and a contract attached." The meeting took place on March 28, 2017.

*See*: <u>Stecklow Exh. B</u>: de Quillacq Tr., at 76:20 – 77:14.

56.     When asked to identify the reasons why he did not send a separate recruiting agreement to Clinton Group, Mr. de Quillacq testified:

> The first one is those employees didn't have a contract. So we never knew exactly when we started. We were supposed to have a contract. They lured us a contract. Sorin Alexe, who was representing me now when I was in there was telling me that, you know, we would have a contract, but we never had a formal contract, which means their start date is not too obvious, and the contractual agreement specifies that the fee increases over time as the months pass by. So if I was claiming my placement fee they could have stopped the hiring immediately and said goodbye, Gontran, as per our contractual agreement, we owe you nothing, and, therefore, it made sense not to claim. Second, I came in good faith. You are saying that I was in bad faith and I was asking to have my cake and eat it. Because I am in good faith and because I was looking forward to a long-term relationship with Clinton that would have been worth much more

25

> than the placement fee I did not at that time make my claim. When
> it turns out that Clinton had been in bad faith, on that day where I
> was let go out of nowhere, I said in that case I am requesting my
> placement fee. I was entitled to it. I never withdraw it. I just not
> asked it because I was in good faith, and I claimed it.

*See*: Boyle Exh. A: Gontran Tr., at 140:12-141:16.

57.    When asked whether he did not send a fee agreement because he did not want

them to fire him and not hire these people until his fee would increase over time, Mr. de Quillacq

responded "[n]o. They already had the fee agreement in the link to my email".

*See*: Boyle Exh. A: de Quillacq Tr., at 218:20-219:8.

58.    Sorin Alexe testified that George Hall told him that Mr. de Quillacq "can be taken

care of in a different way, rather than having [him] employed" in consideration for the valuable

introductions Mr. de Quillacq made for the benefit of Clinton Group.

*See*: Boyle Exh. C: Alexe Tr., at 51:16-52:6.

59.    Gontran de Quillacq testified that he uses any type of agreement that "the client

wants" and that he would like to have a separate contract, but if he does not enter into a separate

contract with a client, they "have a default contract in [Navesink International's] disclaimer,

which is binding and all the recruiters know – all the clients know."

*See*: Stecklow Exh. B: de Quillacq Tr., at 240:9-25.

60.    Clinton Group retained Mr. de Quillacq, *inter alia*, to search for outside investors

and raise money for their project.

*See* Boyle Exh. C, Alexe Tr., at 47:20-48:13.

61.    Mr. de Quillacq testified "[w]ell, why would we be here if they had agreed to it"

when asked whether "Clinton agree[d] that this amount that [he] submitted was agreed upon and

accepted as correct?".

*See*: Stecklow Exh. B: de Quillacq Tr., at 242:15-19.

62.     In *dicta*, the court in the state court action found that "Navesink's email communications demonstrate that Navesink approached Clinton Group, as a potential investor, not as a recruiter".

*See*: <u>Stecklow Exh. A</u>: State Court MSJ Decision & Order, CGI 0003.

63.     Clinton Group never provided investment funding to Navesink International, but offered employment to the members of the QML team by agreeing to employment terms, a base salary and a bonus structure.

*See*: <u>Boyle Exh. I</u>: Hall Tr., at 14:3-8; <u>Stecklow Exh. F</u>: Hall Depo Tr., at 57:7-12; <u>Boyle Exh. J</u>, Employment Offer, at Sorin 000003.

Dated: September 16, 2025              Respectfully Submitted,

<div style="margin-left:40%">

*/s/ Dennis E. Boyle*
Dennis E. Boyle, Esquire (Bar ID No. DB2781)
Blerina Jasari, Esquire (Bar ID No. BJ1004)
Boyle & Jasari
1050 Connecticut Ave, N.W.
Suite 500
Washington, D.C., 20036
(771) 217-2400
Email: dboyle@boylejasari.com
        bjasari@boylejasari.com

*Counsel for Defendants*

</div>