USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC#: _____
DATE FILED: 2/19/26

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| CLINTON GROUP, INC., <br><br> Plaintiff, <br><br> -against- <br><br> NAVESINK INTERNATIONAL, LLC and GONTRAN DE QUILLACQ, <br><br> Defendants. | 1:24-cv-05195 (ALC) <br><br> **OPINION & ORDER** |

**ANDREW L. CARTER, JR., United States District Judge**

  Plaintiff Clinton Group commenced this action against Defendants Gontran de Quillaq and Navesink International, LLC, seeking to recover damages under two state tort claims: fraudulent inducement and exposure to litigation as a result of a third-party tort. *See* ECF No. 1 ("Compl."). Both parties move for summary judgment pursuant to Federal Rule of Civil Procedure 56. For the reasons that follow, both motions are **DENIED**.

## BACKGROUND

### I. Factual History

  The Court presumes the parties' familiarity with the underlying facts in this case. A more complete summary of the facts can be found in this Court's March 21, 2025 Opinion and Order denying Defendants' motion to dismiss. *See* ECF No. 18.

  On March 24, 2017, Gontran de Quillacq, the managing partner of Navesink LLC, contacted Clinton Group to introduce himself. ECF No. 33 at ¶ 5. During this communication, de Quillacq did not use an email address that identified himself as a recruiter. *Id*. de Quillacq testified that he used his personal mail address for the following reason:

1

> When [they] were at Salt Creek at the follow-up of these [*sic*] e-mail . . . [he] explain [*sic*] clearly that [he] was coming and introducing that team as a recruiter and, therefore, [he] would from now on use [his] recruiter's email that has a disclaimer and a contract attached. [he] stated it extremely clearly during that Salt Creek conversation . . . [They] are setting up this conversation so that [he] can have a discussion with them and introduce [himself] as a recruiter then. Why, because when you see recruiter, for whatever reason, people are not interested in talking to recruiters. When [he has] shown that [he is] highly competent, they are willing to talk to [him], and now [he] can introduce the team as an executive recruiter, which is what [he] did with their agreement.

ECF No. 40 at ¶ 5. This meeting took place on March 28, 2027. ECF No. 47 at ¶ 55.

On March 30, 2017, de Quillac emailed Clinton Group in order "to introduce QML IM to Glassbridge/ The Clinton Group for investment consideration."[1] ECF No. 44 at ¶ 7. In this email, de Quillacq introduced the QML IM team to Robert Picard of Glassbridge Enterprises, Inc., and to George Hall and Peter Rawlings of Clinton Group. *Id*.; *see also* ECF No. 38 at 2. This communication was sent from the email address "Recruiters@NavesinkInternational.com." ECF No. 47 at ¶ 42. A disclaimer was included in smaller type font at the bottom of the email stating "[u]nless we have a contract in place, you agree to our legal terms." *Id*. Also included in the email was a link to the legal terms on Navesink's website and a banner stating "Navesink International Executive Recruitment." *Id*. The legal terms on Navesink's website provide that Clinton Group "engages Navesink Int. to refer candidates to fill positions for employment or business relations" and Clinton Group would be responsible for the payment of a certain referral fee. *Id*. at ¶ 43.

On March 24, 2017, Robert Picard sent the following text message to George Hall: ". . . I met with Gontran de Quillacq 4 months ago in Red Bank when basing Glassbridge in NJ was still contemplated. He's also a recruiter and it sounds like he may have a team to place at Clinton. We

---

[1] A majority of the factual record is undisputed. This factual history is taken from the complaint, *see* Compl., the parties' 56.1 statements and counterstatements, *see* ECF Nos. 33, 40, 44, 47, their briefs, *see* ECF Nos. 32, 38, 39, 46, 48, and documents relied upon therein.

2

could see him again for Clinton needs . . ." *Id*. at ¶ 44. On April 13, 2017, Robert Picard sent the following email to Peter Rawlins: "I figured we would review the strategy/team and if it gets serious take a deeper dive. He's only the Biz Dev guy and/or Recruiter." *Id*. at ¶ 45. In April of 2017, Peter Rawlins was the head of operations for Clinton Group and worked closely with George Hall. *Id*. at ¶ 46.

The QML IM team met with Clinton Group "several times" according to Sorin Alexe, the Portfolio manager in the QML team. ECF No. 44 at ¶ 9. In each of those meetings, de Quillacq "presented our pitch, and we are asking for money and we want to manage that as a team." *Id*. at ¶ 10. Following the QML team's first pitch meeting with Clinton Group, de Quillacq told Mr. Alexe that Clinton Group might not provide the investment funding and if not, "he said that he will act as a recruiter." *Id*. at ¶ 12. Further, Mr. Alexe testified that he discussed with de Quillacq the possibility of Clinton Group not taking the whole team to which de Quillacq "said that if he is going to be out of this relationship he is going to ask Clinton Group to pay for that introduction." *Id*. at ¶ 14. In July 2017, Clinton Group offered employment positions to the QML team members rather than investment funding. *Id*. at ¶ 20. Clinton Group's CEO George Hall testified that in making the offer of employment, he "relied on the fact that the only thing we discussed was investing or whether or not we would basically put them under our umbrella to try to use their trading strategy." *Id*. at ¶ 26. After Clinton Group sought to hire the QML team as employees, de Quillacq did not send a recruiting contract to Clinton Group. *Id*. at ¶ 21. When asked to identify why he did not send a separate recruiting agreement to Clinton Group, de Quillacq testified "if was claiming my placement fee they could have stopped the hiring immediately and said goodbye, Gontran, as per our contractual agreement, we owe you noting, and, therefore, it made sense not to claim" because "I was looking forward to a long-term relationship with Clinton that would have

3

been worth more than the placement fee." ECF No. 47 at ¶ 56. De Quillacq testified that "it's unusual" for a member of a team to also act as a recruiter for the team and that he had never done so before this instance. ECF No. 44 at ¶ 24. Clinton Group terminated de Quillacq's employment in November of 2017. ECF No. 47 at ¶ 47. During his departure meeting, de Quillacq orally requested a fee. *Id*. at ¶ 48. Navesink thereafter made additional efforts to collect the payment of a recruitment fee for the hiring of the QML team. *Id*. at ¶ 49.

As a result of its unsuccessful collection efforts, Navesink sued Clinton in the State Supreme Court for New York in late 2018 for breach of contract to recover its recruitment fee. ECF No. 44 at ¶ 1. After years of litigation, the Honorable Judge Debra James granted Clinton's motion for summary judgment and dismissed all claims against it. *Id*. at ¶ 3; *see also* ECF No. 13-2 ("State Court Order"). In that order, the State Court noted that "Navesink's email communications demonstrate that Navesink approached Clinton, as a potential investor, not as a recruiter." *Id.* at ¶ 4. The State Court found that Navesink's claims "are dismissed because Navesink fail[ed] to offer evidence of its reasonable expectation of compensation for recruitment services." *Id*. at ¶ 8. Clinton Group paid a total of $244, 437.56 to defend itself against Navesink in the State Court action. *Id*. at ¶¶ 37-39.[2]

## II. Procedural History

On July 10, 2024, Plaintiff filed its complaint, initiating this action. *See* Compl. Defendants filed a motion to dismiss the complaint, which the Court denied on March 21, 2025. *See* ECF No. 18. The case was thereafter referred to Magistrate Judge Katherine J. Parker for general pre-trial

---

[2] The Court notes that Defendants "emphasize that Clinton Group's calculation of purported damages appears to include invoices related to an unrelated SEC matter. Defendants further emphasize that Clinton Group requested compensatory damages in the total amount of $133, 728.00 resulting from attorneys fees and expenses alleged incurred in the state court action." ECF No. 44. at ¶ 37.

matters. *See id*. Defendants filed an answer to the complaint on April 15, 2025. *See* ECF No. 23. On July 23, 2025, Plaintiff filed its motion for summary judgement. On August 25, 2025, Defendants filed a cross motion for summary judgement. Both motions are fully briefed. *See* ECF Nos. 32 (Plaintiff's memorandum in support), 38 (Defendants' memorandum in opposition), 39 (Defendants' memorandum in support of cross motion), 46 (Plaintiff's reply in support), 48 (Defendants' reply in support of cross motion).

Plaintiff moves for summary judgement on its fraudulent inducement claim. *See* ECF No. 32 at 5. Defendants move for summary judgement on both the fraudulent inducement claim and the third-party tort claim. *See* ECF No. 38 at 26.

## LEGAL STANDARD

Summary judgment is appropriate where "there is no genuine issue as to any material fact" and "the moving party is entitled to a judgment as a matter of law." *Cortes v. MTA New York City Transit*, 802 F.3d 226, 230 (2d Cir. 2015) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986)) (internal quotation marks omitted); *see also* Fed. R. Civ. P. 56(a). Material facts are those that may affect the outcome of the case. *See Anderson*, 477 U.S. at 248. Speculation, conclusory allegations, and mere denials are not enough to raise genuine issues of fact. *See National Union Fire Ins. Co. of Pittsburgh, Pa. v. Walton Ins. Ltd.*, 696 F. Supp. 897, 900 (S.D.N.Y. 1988). An issue of fact is "genuine" when a reasonable fact finder could render a verdict in the nonmoving party's favor. *See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) ("Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." (internal quotation omitted)).

5

At summary judgment, the moving party has the burden "to demonstrate that no genuine issue respecting any material fact exists." *Gallo v. Prudential Residential Servs., Ltd. P'ship*, 22 F.3d 1219, 1223 (2d Cir. 1994). To avoid summary judgment, a party must "do more than simply show that there is some metaphysical doubt as to the material facts." *Id.* at 586. When the moving party has met its burden, "the nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment." *Simsbury-Avon Pres. Soc'y LLC v. Metacon Gun Club, Inc.*, 575 F.3d 199, 204 (2d Cir. 2009). "When the burden of proof at trial would fall on the nonmoving party, it ordinarily is sufficient for the movant to point to a lack of evidence to go to the trier of fact on an essential element of the nonmovant's claim. In that event, the nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial." *Id.* When a motion for summary judgment is unopposed, a court "may not grant the motion without first examining the moving party's submission to determine if it has met its burden of demonstrating that no material issue of fact remains for trial." *D.H. Blair & Co. v. Gottdiener*, 462 F.3d 95, 110 (2d Cir. 2006) (quoting *Vt. Teddy Bear Co. v. 1-800 Beargram Co.*, 373 F.3d 241, 244 (2d Cir. 2004)) (internal quotation marks omitted).

"If there are cross-motions for summary judgment, the Court must assess each of the motions and determine whether either party is entitled to judgment as a matter of law." *Gen. Ins. Co. of Am. v. Starr Indem. & Liab. Co.*, No. 14-CV-07354 (JGK), 2016 WL 4120635, at *4 (S.D.N.Y. July 22, 2016) (citing *Heublein, Inc. v. United States*, 996 F.2d 1455, 1461 (2d Cir. 1993)). "[W]hen both sides move for summary judgment, neither side is barred from asserting that there are issues of fact, sufficient to prevent the entry of judgment, as a matter of law, against it. When faced with cross-motions for summary judgment, a district court is not required to grant judgment as a matter of law for one side or the other." *Heublein, Inc.*, 996 F.2d at 1461 (citation

6

omitted). Instead, the court must "evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration." *Id.* (citation omitted).

In deciding a summary judgment motion, courts must construe the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor. *See Niagara Mohawk Power Corp. v. Jones Chemical Inc.*, 315 F.3d 171, 175 (2d Cir. 2003). Courts may not assess credibility, nor may they decide between conflicting versions of events because those matters are reserved for the jury. *See Jeffreys v. City of New York*, 426 F.3d 549, 553–54 (2d Cir. 2005). However, "[t]he mere existence of a scintilla of evidence in support of the [nonmovant]'s position will be insufficient; there must be evidence on which the jury could reasonably find for the [nonmovant]." *Id.* (citing *Anderson*, 477 U.S. at 252).

## DISCUSSION

### I. Fraudulent Inducement

To succeed on a claim of fraudulent inducement under New York law, a plaintiff must establish "(1) a misrepresentation or omission of material fact; (2) which the defendant knew to be false; (3) which the defendant made with the intention of inducing reliance; (4) upon which the plaintiff reasonably relied; and (5) which caused injury to the plaintiff." *Wynn v. AC Rochester*, 273 F.3d 153, 156 (2d Cir. 2001) (per curiam). The burden of proof for fraudulent inducement is clear and convincing evidence. *See CCM Rochester, Inc. v. Federated Invs., Inc.*, 234 F. Supp. 3d 501, 506 (S.D.N.Y. 2017).

### *a. Whether de Quillacq Made a Misrepresentation or Omission of Material Fact*

Beginning with Plaintiff's motion, Plaintiff contends that "de Quillacq misrepresented to Clinton Group that he sought to meet with Clinton Group only to obtain investment funding." ECF No. 32 at 9. To support this, Plaintiff relies on the March 30, 2017 email in which de Quillac emailed Clinton Group in order "to introduce QML IM to Glassbridge/ The Clinton Group for investment consideration." ECF No. 44 at ¶ 7. Plaintiff further provides evidence that the QML IM team met with Clinton Group "several times" according to Sorin Alexe, the Portfolio manager in the QML team. ECF No. 44 at ¶ 9. In each of those meetings, de Quillacq "presented our pitch, and we are asking for money and we want to manage that as a team." *Id*. at ¶ 10. Lastly, Clinton Group's CEO George Hall testified that in making the offer of employment, he "relied on the fact that the only thing we discussed was investing or whether or not we would basically put them under our umbrella to try to use their trading strategy." *Id*. at ¶ 26.

Accordingly, Plaintiff fails to meet its burden in establishing that no material issue of fact remains for trial. Indeed, there remains an issue of material fact as to whether seeking investment funding was de Quillacq's *sole* or *only* purpose in meeting and establishing a relationship with Clinton Group. Such questions of fact are inappropriate for the Court to decide on a motion for summary judgement. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247—48 (1986); *see also Jeffreys v. City of New York*, 426 F.3d 549, 553-54 (2d Cir. 2005).

Turning to Defendants' motion, Defendants argue that neither Navesink nor Mr. de Quillacq made any false statement or misrepresentation and that Plaintiff's evidence is taken out of context. ECF No. 38 at 5. Defendants' put forth evidence that the email in which de Quillacq sought out Clinton Group for "investment consideration" was sent from the email address "Recruiters@NavesinkInternational.com"; a disclaimer was included in smaller type font at the

8

bottom of the email stating "[u]nless we have a contract in place, you agree to our legal terms"; also included in the email was a link to the legal terms on Navesink's website and a banner stating "Navesink International Executive Recruitment"; and the legal terms on Navesink's website provide that Clinton Group "engages Navesink Int. to refer candidates to fill positions for employment or business relations" and Clinton Group would be responsible for the payment of a certain referral fee. ECF No. 47 at ¶¶ 42-43.

Further, Defendants' put forth evidence that head of operations and CEO of Clinton Group were aware that de Quillacq did work as a recruiter. On March 24, 2017, Robert Picard sent the following text message to George Hall: ". . . I met with Gontran de Quillacq 4 months ago in Red Bank when basing Glassbridge in NJ was still contemplated. He's also a recruiter and it sounds like he may have a team to place at Clinton. We could see him again for Clinton needs . . ." *Id*. at ¶ 44. On April 13, 2017, Robert Ricard sent the following email to Peter Rawlins: "I figured we would review the strategy/team and if it gets serious take a deeper dive. He's only the Biz Dev guy and/or Recruiter." *Id*. at ¶ 45.

Based on this evidence, there remains a genuine issue of material fact as to the email address, the disclaimer in the email, and the emails sent by Robert Picard. This relates to the same factual question inappropriate for the Court to address at this procedural stage: whether it would be reasonable to conclude that de Quillacq's misrepresented that his *sole* purpose in meeting with Clinton Group was to solicit investment funding given Clinton Group's knowledge that de Quillacq worked as a recruiter.

    b. *Knowledge of Falsity*

As to knowledge of falsity, Plaintiff puts forth evidence that Sorin Alexe, the Portfolio manager in the QML team, testified that the QML team met with Clinton Group several times and

9

in each of those meetings, de Quillacq "presented our pitch, and we ask asking for money and we want to manage that as a team." ECF No. 44 at ¶¶ 9-10. Mr. Alexe further testified that following the first of WML's pitch meetings with Clinton Group, de Quillacq told Mr. Alexe that Clinton Group might not provide the investment funding and if not, "he said that he will act as a recruiter." *Id*. at ¶ 12. Further, Mr. Alexe testified that he discussed with de Quillacq the possibility of Clinton Group not taking the whole team to which de Quillacq "said that if he is going to be out of this relationship he is going to ask Clinton Group to pay for that introduction." *Id*. at ¶ 14.

Plaintiff contends that this evidence eliminates "any genuine issue of fact concerning de Quillacq's knowledge that his representations were false" because it shows that de Quillacq "intended to seek a recruiting fee, but he nonetheless continued to represent to Clinton Group in the second and third pitch meetings only that 'we are asking for money and we want to manage that as a team.'" ECF No. 32 at 11. To the contrary, the Court finds this evidence does not necessarily establish that de Quillacq knew his representations were false as a reasonable factfinder could find that de Quillacq intended to seek a recruitment fee if Clinton Group did not provide the investment funding or if they did not hire de Quillacq onto the team. This does not necessarily mean that de Quillacq misrepresented that QML was seeking investment funding. Indeed, the success of Plaintiff's argument here hinges on their contention that de Quillacq's false representation was that his *sole* purpose in meeting with the Clinton Group would be to solicit investment funding for a start-up hedge fund to be managed by his team." Compl. ¶ 113. As addressed above, this remains a disputed issue of material fact. As such, the second element as to knowledge of falsity also remains in dispute.

### c. *Intent to Induce Reliance*

To support the third element of its claim, Plaintiff puts forth evidence that de Quillacq's intention was to induce Clinton Group's reliance and forbearance from further inquiry. ECF No. 32 at 11. First, Plaintiff argues that de Quillacq took affirmative steps to hide that he was a recruiter and would seek fees if Clinton Group hired any member of the QML team. *Id*. Plaintiff puts forth evidence that on March 24, 2017, when de Quillacq emailed Clinton Group for the first time, he did not use an email address that identified him as a recruiter because "when you see a recruiter, for whatever reason, people are not interested in talking to recruiters." ECF No. 40 at ¶ 5. Further, Plaintiff argues that when Clinton Group hired the QML team as employees, de Quillacq also intentionally did not send a recruiting contract to Clinton Group because they may have declined to hire the team and "because my placement fee increases over time." ECF No. 32 at 11-12; *see also* ECF No. 40 at ¶ 21; *see also* ECF No. 47 at ¶ 56. Based on these facts, Plaintiff argues it is undisputed that de Quillacq intended to induce Plaintiff to proceed with its offer of employment in reliance on his repeated representations that he solely sought investment funding in order to later claim a recruiting fee. ECF No. 32 at 12.

Defendants put forth evidence adding to the context of the above statements. As to de Quillacq's reasons for not using an email address identifying him as a recruiter in the first email on March 24, 2017, de Quillacq explained that:

> We are setting up this conversation so that I can have a discussion with them and introduce myself as a recruiter then. Why, because when you see a recruiter, for whatever reason, people are not interested in talking to recruiters. When I've shown that I'm highly competent, they are willing to talk to me, and now I can introduce the team as an executive recruiter, which is what I did with their agreement.

ECF No. 47 at ¶ 54. De Quillacq further testified that "I explain clearly that I was coming and introducing that team as a recruiter and, therefore, I would from now on use my recruiter's e-mail

11

that has a disclaimer and a contract attached." *Id*. at ¶ 55. This meeting too place on March 28, 2017. *Id*. Two days later, de Quillacq sent the March 30, 2017 email from the "Recruiters@NavesinkInternational.com" email address, including the "Navesink International Executive Recruitment" banner. No. 47 at ¶ 42.

As to Plaintiff's second argument as to why de Quillacq did not send a recruiting contract upon the team being hired, Defendants put forth evidence that de Quillacq postponed the requesting of a recruitment fee in good faith. Defendants put forth that de Quillacq testified he did not request a recruitment fee at this time because "I was looking forward to a long-term relationship with Clinton that would have been worth much more than the placement fee." *Id*. at ¶ 56. It wasn't until de Quillacq was terminated in November of 2017 and the "long-term relationship" did not come to fruition that de Quillacq requested payment for the recruitment fee. *Id*. at ¶ 49.

The Court finds that a genuine issue of material fact exists as to whether de Quillacq intentionally induced Plaintiff to extend an offer of employment with the goal of later claiming a recruitment fee. Defendants' evidence suggests that de Quillacq may not have had an intention to collect a recruitment fee had he not been terminated. However, this is a question of fact that turns on de Quillacq's credibility which is not a question appropriate for the Court to address at this stage. Courts may not assess credibility, nor may they decide between conflicting versions of events because those matters are reserved for the jury. *See Jeffreys v. City of New York*, 426 F.3d 549, 553–54 (2d Cir. 2005).

### d. *Reasonable Reliance*

Plaintiff asserts that in making its July 7, 2017 employment offer, the Clinton Group relied on de Quillaq's false representation that he solely sought investment funding in the hedge fund industry. ECF No. 32 at 12; *see also* Compl. ¶ 67. "In assessing the reasonableness of a plaintiff's

alleged reliance, we consider the entire context of the transaction, including factors such as its complexity and magnitude, the sophistication of the parties, and the content of any agreements between them." *Emergent Cp. Inv. Mgmt., LLC v. Stonepath Grp., Inc.*, 343 F.3d 189, 195 (2d Cir. 2003). Plaintiff argues that the "entire context of the transaction" was defined by Defendants' March 30, 2017 email seeking "investment consideration." ECF No. 32 at 13. However, under New York law, a "party cannot claim reliance on a misrepresentation when he or she could have discovered the truth with due diligence." *KNK Enters., Inc. v. Harriman Enters., Inc.*, 33 A.D.3d 872, 824 N.Y.S.2d 307 (2006). Defendants put forward evidence showing that in that same email, there was a disclaimer stating "[u]nless we have a contract in place, you agree to our legal terms," a link to the legal terms on Navesink's website which include reference to a recruitment fee, and a banner stating "Navesink International Executive Recruitment." ECF No. 47 at ¶¶ 42-43. Further, the email was sent from the email address "Recruiters@NavesinkInternational.com." *Id*. at ¶ 42.

The Court finds there remain disputed issues of fact regarding reasonable reliance, including the email address, the disclaimer in the email, and the email sent by Robert Picard. The Court notes that it need not reach the element of injury as there remains disputes issues of fact related to liability.

## II.  Collateral Estoppel Does Not Apply

Plaintiff argues that Defendants are collaterally estopped from relitigating their "misrepresentation". *See* ECF No. 32 at 4. Plaintiff asks the Court to take notice of two factual determinations in the prior state court proceeding. *See* ECF No. 32 at 4-5. First, Plaintiff argues the judge in the prior proceeding determined as a fact that "Navesink's email communications demonstrate that Navesink approached Clinton, as a potential investor, not as a recruiter." ECF No. 32 at 5. Plaintiff further states the state court determined as fact that "Navesink's email

communications . . . dated March 30, 2017, plainly states that Gontran 'would like to introduce [QML] to [Clinton] for investment consideration.'" *Id*. (emphasis omitted). Plaintiff argues that because the state court determined these two facts in the prior proceeding, Defendants should now be precluded from relitigating "the proof supporting the first element of Plaintiff's fraud claim." ECF No. 32 at 7. Specifically, Plaintiff argues the state court's factual determinations preclude Defendants from contesting "that Defendants represented to Clinton Group that de Quillacq sought only investment funding from Clinton Group." *Id*. at 9.

"Under the doctrine of collateral estoppel, when an issue of ultimate fact has once been determined by a valid and final judgment, that issue cannot again be litigated between the same parties in any future lawsuit." *U.S. v. U.S. Currency in Amount of $119,984.00, More or Less*, 304 F.3d 165, 172 (2d Cir. 2002) (citing *Schiro v. Farley*, 510 U.S. 222, 232 (1994)) (internal quotations omitted). For collateral estoppel to apply, four requirements must be met: "(1) the identical issue was raised in a previous proceeding; (2) the issue was actually litigated and decided in the previous proceeding; (3) the party had a full and fair opportunity to litigate the issue; and (4) the resolution of the issue was necessary to support a valid and final judgment on the merits." *Wyly v. Weiss*, 697 F.3d 131, 141 (2d Cir. 2012) (quoting *Marvel Characters, Inc. v. Simon*, 310 F.3d 280, 288–89 (2d Cir. 2002)) (alteration in original). "The burden of proof with respect to whether an issue is identical to one that was raised and necessarily decided in the prior action rests squarely on the party moving for preclusion." *Sullivan v. Gagnier*, 225 F.3d 161, 166 (2d Cir. 2000).

Considering the first prong, Plaintiff fails to establish that the issue raised in the state court proceeding is identical to the one being raised here. "For two issues to be 'identical,' they must involve not only the same factual predicate, but also the same legal standard." *Stinnett v. Delta Air Lines, Inc.*, 803 F. App'x 505, 507 (2d Cir. 2020) (citing *B & B Hardware, Inc. v. Hargis Indus.,*

14

*Inc.*, 575 U.S. 138, 154 (2015)). Plaintiff cites to *Matusick v. Erie County Water Auth.*, 757 F.3d 31, 48 (2d. Cir. 2014) to for the finding that "[a]n issue is a single, certain and material point arising out of the allegations and contentions of the parties. It may concern only the existence or non-existence of certain facts."

In *Matusick*, the Second Circuit explained that critical to the question of issue identicality is the determination of whether the issue involves a factual or legal determination. *Matusick v. Erie Cnty. Water Auth.*, 757 F.3d at 48. Indeed, "If the issues are merely [factual], they need only deal with the same past events to be considered identical. However, if they concern the legal significance of those facts, the legal standards to be applied must also be identical; different legal standards as applied to the same set of facts create different issues." *Id*. at 48-49. The *Matusick* Court considered whether the issue of a hearing officer's findings of fact and ultimate conclusions should have a preclusive effect in the subsequent employment discrimination claims. *See id*. The *Matusick* Court ultimately precluded Matusick from relitigating the factual findings supporting the hearing officer's ultimate conclusion such as the fact that Matusick had failed to perform all of his duties on the job *See id*. at 49. However, the hearing officer's ultimate conclusion was not given preclusive effect because the hearing officer's ultimate conclusions in the section 75 proceedings were guided by specific legal standards that differed substantially from the legal framework used in state and federal employment discrimination law. *See id.* Thus, even though the hearing officer concluded in the prior section 75 proceeding that Matusick had committed disciplinable misconduct and was incompetent, this was not preclusive of the jury making their own determination with respect to the reasons for Matusick's termination in the subsequent employment discrimination proceeding.

15

This distinction is relevant here because Plaintiff asks the Court to give preclusive effect to the state court's factual determinations such that Defendants would be barred from relitigating the evidence supporting the "misrepresentation" element and contesting "that Defendants represented to Clinton Group that de Quillacq sought only investment funding from Clinton Group." ECF No. 32 at 9. However, the legal standards in the prior state proceeding differ greatly from the framework employed for fraudulent inducement. The state court proceeding involved claims for quantum meruit and unjust enrichment which were dismissed at the summary judgement stage "because Navesink fails to offer evidence of its reasonable expectation of compensation for recruitment services." *Id*. at 5. The issue in the state court proceeding focused on the factual determination of whether Navesink approached Clinton as a potential investor, not as a recruiter, only to the extent it related to Navesink's reasonable expectation to receive a recruitment fee. Because the state court determined Navesink approached Clinton as an investor rather than a recruiter, the state court resolved Navesink therefore did not have a reasonable expectation of compensation for services as a recruiter. This is a separate question from the one presented in the present case: whether de Quillacq and Navesink made misrepresentations to Clinton Group and whether Clinton Group was reasonable in relying on any such misrepresentations. Defendants may, and indeed do, put forward arguments as to why they did not make a misrepresentation of material fact notwithstanding the state court's factual determination that Navesink approached Clinton for investment consideration. The legal standards for unjust enrichment and quantum meruit are significantly different than the standard for fraudulent inducement. Indeed, the standards for unjust enrichment and quantum meruit do not require a court to determine whether Defendants made a misrepresentation of material fact.[3] As such, the issues here are not identical, and Defendants

---

[3] To establish unjust enrichment under New York law, a plaintiff must demonstrate (i) the defendant was enriched, (ii) the enrichment occurred at the plaintiff's expense, (iii) it would contravene equity and good conscious to permit

should not be precluded from relitigating the proof regarding the first element fraudulent inducement—misrepresentation of a material fact.

Further, the first prong of collateral estoppel—issue identicality—also fails here as the burden of proof in the present action is greater than in the prior action. "Courts and commentators alike have recognized that a shift or change in the burden of proof can render the issues in two different proceedings non-identical, and thereby make collateral estoppel inappropriate." *Cobb v. Pozzi*, 363 F.3d 89, 113 (2d Cir. 2004) (internal citations omitted). Unjust enrichment and *quantum meruit* claims both require a preponderance of the evidence standard.[4] Fraudulent inducement requires a standard of clear and convincing evidence, a more stringent standard than preponderance. "Failure of one party to carry the burden of persuasion on an issue should not establish the issue in favor of an adversary who otherwise would have the burden of persuasion on that issue in later litigation." 18 C. Wright, A. Miller & E. Cooper, *Federal Practice and Procedure* § 4422 at 592 (2002). In the prior determination, Navesink, the plaintiff in that action, failed to meet its burden by a preponderance of the evidence to establish a reasonable expectation of compensation for recruitment services. Clinton Group, Plaintiff in the current action, should not benefit from Navesink's failure to meet a lower burden in the previous action when Plaintiff's carry an even heavier burden in the present action. Indeed, a "party's success in an earlier proceeding where it faced a lower burden of proof does not mean that, against a higher burden of

---

the defendant to retain the benefit without compensating the plaintiff. *See Columbia Mem. Hosp. v. Hinds*, 38 N.Y.3d 253, 274 (N.Y. 2022). To establish *quantum meruit*, the plaintiff must establish (i) the performance of services in good faith, (ii) the acceptance of those services by the defendant, (iii) a reasonable expectation of compensation for the services, and (iv) the reasonable value of the services rendered. *See Aquilla v. Villa*, 240 A.D.3d 48 (App. Div. 2d Dep't 2025).

[4] *See, e.g., J & K Parris Const., Inc. v. Roe Ave., Assoc., Ltd.*, 47 Misc 3d 1227(A), 18 N.Y.S.3d 579 (N.Y. Sup. Ct. 2015) ("The burden of proof rests with the plaintiff who must establish the truth and validity of each claim [specifically, of unjust enrichment] by a fair preponderance of the credible evidence."); *Matter of Hall*, 144 Misc. 616, 618-19, 259 N.Y.S. 455 (finding that to authorize recovery on *quantum meruit*, claimant need prove case by fair preponderance of evidence only); *CCM Rochester, Inc. v. Federated Invs., Inc.*, 234 F. Supp. 3d 501, 506 (S.D.N.Y. 2017) (burden of proof for fraudulent inducement is clear and convincing evidence).

17

proof in a subsequent proceeding, that party would achieve the same result." *Cobb v. Pozzi*, 363 F.3d at 114. "To apply issue preclusion [when the burden of proof is heavier in the second litigation] would be to hold, in effect, that the losing party in the first action would also have lost had a significantly different burden [been] imposed." *Id*. (internal quotations and citations omitted). While Plaintiff is correct that differing burdens of proof does not always require the courts to find that collateral estoppel does not apply, it is not evident here that the burden of proof "played little to no role in the prior factual determination." *Kosakow v. New Rochelle Radiology Assocs., P.C.*, 274 F.3d 706, 731 (2d Cir. 2001). As such, this further weighs against a finding of issue identicality necessary to establish the first prong of collateral estoppel. Therefore, the Court hereby **declines** to apply collateral estoppel to preclude Defendants from relitigating the issue of misrepresentation of a material fact in this action.

### III. Third-Party Tort Claim

As part of Defendants' motion for summary judgement, they argue Clinton Group is unable to establish the essential elements of its tort claim based on fraudulent misrepresentation for the same reasons discussed above. ECF No. 38 at 28. As there still remains a disputed issue of material fact as to whether a misrepresentation was made, as discussed above, Defendants have failed to meet their initial burden for this claim.

## CONCLUSION

For the foregoing reasons, both Plaintiff's and Defendants' motions for summary judgment are hereby **DENIED.** The Clerk of the Court is respectfully directed to terminate the pending motions at ECF Nos. 31 and 37.

**SO ORDERED.**

**Dated: February 19, 2026**
    **New York, New York**

                                      **ANDREW L. CARTER, JR.**
                                      **United States District Judge**